In re MERRILL LYNCH & CO., INC. Research Reports Securities Litigation

In re Merrill Lynch & Co., Inc. 24/7 Real Media, Inc. Research Reports Securities Litigation

In re Merrill Lynch & Co., Inc. Interliant, Inc. Research Reports Securities Litigation

No. 02 MDL 1484 MP.

Nos. 02 CV 3210 MP, 02 CV 3321 MP.

United States District Court, S.D. New York.

June 30, 2003.

Order Denying Reconsideration Aug. 12, 2003.

Kaplan Fox & Kilsheimer LLP, (By Frederic S. Fox, Laurence D. King, Donald R. Hall, of counsel), New York City, for Plaintiffs' Liaison Counsel.

Cohen, Milstein, Hausfeld & Toll, P.L.L.C., (By Herbert E. Milstein, Steven J. Toll, Joshua S. Devore, of counsel), Washington, DC, for the Interliant Class Co–Chairs of Plaintiffs' Executive Committee.

Shapiro Haber & Urmy LLP, (By Edward F. Haber, Michelle Blauner, Theodore M. Hess–Mahan, of counsel), Boston, MA, Co–Chairs of Plaintiffs' Executive Committee.

Finkelstein, Thompson & Loughran, (By Donald G. Thompson, Donald J. Enright, Conor R. Crowley, Adam T. Savett, of counsel), Washington, DC, for the 24/7 Class Member of Plaintiffs' Executive Committee.

Rabin, Murray & Frank LLP, (By Jacqueline Sailer, Eric J. Belfi, Sharon M. Lee, of counsel), New York City, Co-Chairs of Plaintiffs' Executive Committee.

Skadden, Arps, Slate, Meager & Flom LLP, (By Jay B. Kasner, Edward J. Yodowitz, Scott D. Musoff, Joanne Gaboriault), New York City, for Defendants Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated.

Foley & Lardner, (By Douglas M. Hagerman, James D. Ossyra, of counsel), Chicago, IL, Samuel J. Winer, Washington, DC, for Defendant Henry Blodget.

### DECISION AND ORDER

POLLACK, Senior District Judge.

Defendants *Merrill Lynch & Co., Inc.* (ML & Co.) and its wholly-owned subsidiary *Merrill Lynch, Pierce, Fenner & Smith Inc.* (MLPF & S) move to dismiss the amended class action complaints in the 24/7 Real Media, Inc. (24/7) and Interliant,

Inc. (Interliant) consolidated actions for, *inter alia,* (1) failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and (2) failure to plead fraud with particularity, as required by the Private Securities Litigation Reform Act of 1995 (Reform Act) (*see* 15 U.S.C. § 78u–4(b)) and Rule 9(b) of the Federal Rules of Civil Procedure. Individual defendant Henry Blodget (Blodget) joins the motion.[1] For the reasons set forth below, the motion is granted.

### LEGAL STANDARDS – RULE 12(b)(6) AND FRAUD ALLEGATIONS

In deciding a motion to dismiss under Rule 12(b)(6), this Court, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiffs' favor,"[2] must dismiss the action if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."[3] The Court's role is "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."[4] "General, conclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint."[5]

---

1. "Defendants" is used collectively to refer to the corporate and individual defendants together throughout this opinion.

2. *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161 (2d Cir.2000); *see Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000); *Koppel v. 4987 Corp.,* 167 F.3d 125, 130 (2d Cir.1999). Only "well-pleaded" allegations are accepted as true, *see Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994).

3. *In re Scholastic Corp. Secs. Litig.,* 252 F.3d 63, 69 (2d Cir.2001) (*quoting Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2d Cir.1991) (same).

4. *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980); *see Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 124 (2d Cir.1991).

5. *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995) (*citing Jenkins v. S & A Chaisson & Sons, Inc.,* 449 F.Supp. 216, 227 (S.D.N.Y.1978)); *see* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1363, at 464–65 (2d ed.1990); *see also In re American Express Co. Shareholder Litig.,* 39 F.3d 395, 400–401 n. 3 (2d Cir.1994) ("[C]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss.") (collecting cases).

In the fraud context, plaintiffs do not enjoy a "license to base claims ... on speculation and conclusory allegations."[6] Federal Rule of Civil Procedure 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Second Circuit has held that, at a minimum, the complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent–specifying who made them and where and when they were made.[7] This particularity requirement is reinforced by the Reform Act, in which Congress required that all private securities class action complaints alleging material misrepresentations or omissions "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."[8]

■ In deciding a Rule 12(b)(6) motion, the Court may consider the following materials: (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference,[9] (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference,[10] (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in

6. *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 813 (2d Cir.1996) (*quoting Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990)); *see also Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir.1972) ("Mere conclusory allegations to the effect that defendant's conduct was fraudulent or in violation of Rule 10b–5 are insufficient.") (*quoting Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 444 (2d Cir.1971)).

7. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993).

8. 15 U.S.C. § 78u–4(b)(1).

9. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000) ("For purposes of a.motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference ....") (*citing Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989)); *Stuto v. Fleishman*, 164 F.3d 820, 826 n. 1 (2d Cir.1999) (*citing Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir.1996)) (same).

While the Second Circuit has stated that "limited quotation does not constitute incorporation by reference," *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989) (*quoting Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985)), the "line between incorporating by reference and not doing so ... is fine," *Kas v. Chase Manhattan Bank, N.A.*, 1990 WL 113185, at *4 (S.D.N.Y. July 30, 1990) (*citing*

*Ruff v. Genesis Holding Corp.*, 728 F.Supp. 225, 227 n. 2 (S.D.N.Y.1990) ("Because the PPM was referred to extensively throughout the Complaint, rather than merely quoted from sporadically, we regard it as having been incorporated by reference into the Complaint.") (distinguishing *Cosmas* ). *See also Oppenheimer*, 936 F.2d at 762 ("[W]e examine the prospectus together with the allegations contained on the face of the complaint. We do so ... despite the fact that the complaint contains only 'limited quotation' from that document.").

10. *See International Audiotext Network, Inc. v. American Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) ("Although the amended complaint in this case does not incorporate the Agreement, it relies heavily upon its terms and effect; therefore, the Agreement is 'integral' to the complaint, and we consider its terms in deciding whether [plaintiff] can prove any set of facts that would entitle it to relief."); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) ("[T]he district court ... could have viewed [the documents] on the motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim"); *Oppenheimer*, 936 F.2d at 762 ("The prospectus is integral to the complaint.... We therefore decline to close our eyes to the contents of the prospectus and to create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the prospectus to the complaint or to incorporate it by reference.").

framing the complaint,[11] (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission,[12] and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.[13]

### PROLOGUE

The two cases before the Court are part of a large group assigned to this Court by the Multidistrict Panel for consolidated administration. These cases, and the New York Attorney General's report which precipitated them, brought to specific public attention certain aspects of the internal operations in securities firms that had notoriously and long existed and had been variously publicized but not focused on as undesirable conflicts that should be ameliorated, modified, conceivably controlled or eliminated.

Securities firms had traditionally employed on their rosters paid professional analysts to furnish their opinions and predictions of future targets of prices for the securities being handled by the firms, in effect "risk advisors." Those opinions and predictions were broadcast extensively and distributed free of charge. No customer relationship with defendants is claimed by the plaintiffs; no fiduciary or contractual relations existed, at least none is claimed.

Those analyst "seers" and their employers have been faulted in the present cases with having conflicting self-interests which influenced and impaired the publicized advice and opinions by exhortations of "BUY" advice and "Target" expectations to market speculators in the then popular internet field.

At the times here involved, the stock markets were in the throes of a colossal "bubble" of panic proportions. Speculators abounded to capitalize on the opportunities presented by this bubble.

The market "bubble" burst intervened before plaintiffs got out of their holdings and their holdings lost value. The plaintiffs, learning of the subsequent actions of the regulators concerning the conflicts mentioned above, rushed to the courts in these cases seeking to recover the losses they experienced due to the intervening cause, the burst of the bubble.

---

**11.** *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) ("[O]n a motion to dismiss, a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.' ") (*quoting Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993)); *Rothman*, 220 F.3d at 88–89; *Cortec*, 949 F.2d at 47 ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

**12.** *Rothman*, 220 F.3d at 88; *Cortec*, 949 F.2d at 47 ("[W]hen a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC...."); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991) (giving rationale for allowing district courts to consider this information on Rule 12(b)(6) motion).

**13.** *Chambers*, 282 F.3d at 153 ("[O]n a motion to dismiss, a court may consider ... 'matters as to which judicial notice may be taken ....' ") (*quoting Brass*, 987 F.2d at 150); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995); *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991) ("In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken."); *Kramer*, 937 F.2d at 774.

The companies involved herein were duly registered with the SEC. Their assets, liabilities and economics were there disclosed for any holder or purchaser including these plaintiffs to evaluate at his own risk. What was missing, was what a willing buyer would pay to a willing seller to own the stock–with all the relevant information of the fully published underlying corporate values there for everyone to see and evaluate.

In the euphoric early phase of the bubble experienced by the market–buyers of stock traded in the optimistic expectation of finding someone who valued acquiring and possessing the stock at a level higher than the holder did–even if some of the risk analysts of the stock privately had doubts from time to time, on price, future market value, but not underlying assets.

The risk manager's forecasts on future price were both correct and incorrect–depending on the timing of the mercury level in the market thermometer. "Buy" or "accumulate" opinion was an appraisal of the direction of the unsteady market fever. Those who listened to those prognostications were rewarded with huge paper profits if they cashed in – depending on the cycle of the bubble. Others missed out with the collapse of the fever.

### OVERVIEW

The record clearly reveals that plaintiffs were among the high-risk speculators who, knowing full well or being properly chargeable with appreciation of the unjustifiable risks they were undertaking in the extremely volatile and highly untested stocks at issue, now hope to twist the federal securities laws into a scheme of cost-free speculators' insurance. Seeking to lay the blame for the enormous Internet Bubble solely at the feet of a single actor, Merrill Lynch, plaintiffs would have this Court conclude that the federal securities laws were meant to underwrite, subsidize, and encourage their rash speculation in joining a freewheeling casino that lured thousands obsessed with the fantasy of Olympian riches, but which delivered such riches to only a scant handful of lucky winners. Those few lucky winners, who are not before the Court, now hold the monies that the unlucky plaintiffs have lost–fair and square–and they will never return those monies to plaintiffs. Had plaintiffs themselves won the game instead of losing, they would have owed not a single penny of their winnings to those they left to hold the bag (or to defendants).

Notwithstanding this – the federal securities laws at issue here only fault those who, *with intent to defraud,* make a *material* misrepresentation or omission of *fact* (not opinion) in connection with the purchase or sale of securities that *causes* a plaintiff's losses. Considering all of the facts and circumstances of the cases at bar, and accepting all of plaintiffs' voluminous, inflammatory and improperly generalized allegations as true, this Court is utterly unconvinced that the misrepresentations and omissions alleged in the complaints have been sufficiently alleged to be cognizable misrepresentations and omissions made with the intent to defraud. Plaintiffs have failed to adequately plead that defendant and its former chief internet analyst *caused* their losses. The facts and circumstances fully within this Court's proper province to consider on a motion to dismiss show beyond doubt that plaintiffs brought their own losses upon themselves when they knowingly spun an extremely high-risk, high-stakes wheel of fortune.

### FACTUAL BACKGROUND AND ALLEGATIONS

Defendant ML & Co. is a holding company through which defendant MLPF & S provides research, brokerage, and investment banking services. From February

1999 through December 2001, defendant Blodget was a first vice president of Merrill Lynch and its primary analyst for companies in the internet sector. During the putative class periods, Merrill Lynch issued research reports on a number of different internet companies, including 24/7 and Interliant. Many of these reports included analysts' opinions on whether investors should buy the stocks at issue.

Plaintiffs are those investors in 24/7 and Interliant stocks who, during the putative class periods, purchased shares in the respective companies and subsequently lost money.[14] Suing to recoup these losses, they allege that the predictions expressed in Merrill Lynch research reports caused their losses. Reliance is alleged through the fraud-on-the-market theory. None of the plaintiffs alleges actually to have seen or read the analyst reports themselves. Indeed, none of the plaintiffs claims to have been a customer of Merrill Lynch or to have purchased the securities through Merrill Lynch; all concede that they were non-client purchasers.[15]

Plaintiffs allege that the analyst opinions expressed in the research reports were materially misleading and violated Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act) and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission. In support of the fraud allegations, plaintiffs rely almost exclusively on, and quote heavily from, an affidavit prepared by Eric Dinallo of the

New York State Attorney General's Office (Dinallo affidavit).[16] The affidavit, filed April 8, 2002–more than a year after the close of the two class periods–detailed the efforts of the New York Attorney General to investigate defendants' internet research group.

The Dinallo affidavit was offered in support of an application before the New York state courts for an order, pursuant to New York state law, requiring Merrill Lynch employees to turn over documents and give testimony in the Attorney General's continuing investigation into whether defendants violated New York state law. Soon after the affidavit became public, plaintiffs filed these federal class action suits (now consolidated before this Court) against defendants alleging violations of the federal securities laws, including the federal provisions mentioned above. The Dinallo affidavit notes that the state regulations pursuant to which the Attorney General proceeded impose entirely different legal requirements. "Unlike the federal securities laws," the affidavit states, "no purchase or sale of stock is required, nor are intent, reliance, or damages required elements of a violation." [17]

### The research reports

The internet research group at Merrill Lynch prepared two main kinds of reports on the companies that they followed: (1) quarterly Sector Reports (or "Quarterly Handbooks") containing in-depth analyses of the industry and each company in the

---

**14.** The 24/7 and Interliant actions are two of the approximately 27 consolidated actions in this litigation. Each of the actions consolidates cases pertaining to a single issuing company (internet stock) or investment fund. The 25 actions that are not the subject of the instant motion are stayed pending resolution of the legal issues raised in the 24/7 and Interliant motions. The Court will determine at the appropriate time the applicability of the rulings in the present opinion to the remaining consolidated actions.

**15.** Clients of Merrill Lynch were, in most cases, subject to arbitration agreements.

**16.** Plaintiffs have incorporated the affidavit into their complaints by reference.

**17.** Eric R. Dinallo, Affidavit in Support of Application for an Order Pursuant to General Business Law Section 354, at p. 7.

sector covered by Merrill Lynch, and (2) reports focusing on one particular company that took the form of comments, bulletins and notes, which were generally issued in response to news from the issuer or new developments or trends affecting the company that was the subject of the report (hereinafter Company Reports).[18] These reports were sometimes just a few letter-sized, single-spaced pages in length, and other times were several pages or more in length.

The reports show that the internet issuer companies were the primary sources of information for the Merrill Lynch analysts in forming their opinions. Plaintiffs make no allegation that any of the company-related information relied on by the analysts in preparing the reports was in any way false, nor do they allege that the analysts made up facts or misrepresented facts about any of the companies in any of the reports. Rather, plaintiffs allege in the main that the analysts misrepresented their true opinions in the reports (viz., opinions as to whether the stocks should or should not be purchased at the relevant times) and did not disclose certain alleged conflicts of interest within the Merrill Lynch brokerage house. In their brief, plaintiffs also claim–as they must, if they are to have any hope of satisfying federal securities fraud pleading requirements– that their complaints adequately show that these alleged misrepresentations and non-disclosures were material, were made with scienter, were relied upon by them in mak-

ing their purchases, and ultimately resulted in their losses.

There were approximately forty-four Company Reports issued (at irregular intervals) with respect to 24/7 Real Media, Inc. during the alleged 24/7 class period, which stretches from May 12, 1999 through November 9, 2000. There were approximately thirty-four Company Reports issued (also at irregular intervals) with respect to Interliant, Inc. during the alleged Interliant class period, which stretches from August 4, 1999 through February 20, 2001.

The analyst reports discussed the companies' financial reports and revenue information, their respective business models and strategy, and the issuers' own estimates of future performance.[19] The reports frequently contained a description of the analysts' opinions as to the company's competitive position in the industry, including evaluations of comparable companies. In addition, the reports included the analysts' financial models and projections for the companies, evaluations of past company performance against such models and projections, as well as discussion of estimates and projections by other analysts. All told, these evaluations–none of which are alleged to be false or misleading in their factual underpinnings or in their methodology–provided background and support for the analysts' opinions on whether the individual stocks might be considered for purchases or for sales.

---

18. This information is clear from the face of the reports themselves, which are referred to in the complaints. The Court has reviewed the 24/7 research reports issued between September 8, 1998 and November 9, 2000, the Interliant research reports issued between August 4, 1999 and February 21, 2001, and the Sector Reports issued between April 5, 1999 and September 15, 2000. The Court may consider the reports and draw reasonable in-

ferences from them, *see supra* notes 2, 10–11 and accompanying text, because they are the very data that plaintiffs allege was misleading, they are integral to the complaints, and they were known to or in their possession of plaintiffs and utilized in framing the complaints.

19. Some of the reports discuss similar research and projections by firms unaffiliated with Merrill Lynch's internet research group.

Each of the company-specific research reports about which the 24/7 and Interliant plaintiffs complain carried a rating consisting of a two-part designation: (1) a letter (either A, B, C, or D) representing the analysts' opinion of the stock's "Investment Risk Rating," coupled with (2) a pair of numbers (each a numeral between 1 and 5) designating the analysts' opinion of the "Appreciation Potential" of the stock over time.

An Investment Risk Rating of "A" denoted the lowest level of risk. A stock with an "A" rating was expected to exhibit "modest price volatility," and typically represented a company with strong balance sheets, demonstrated long-term profitability, and "stable to rising dividends." A "B" rating meant that the stock was "expected to entail price risk similar to the market as a whole," and represented a company that had "demonstrated the ability to produce above-average sales, profits and other measures of leadership within its industry." A "C" rating indicated "above average risk," and represented companies with balance sheets that were average or below average for their respective industries. The "C" companies in many cases were new to the industry or had erratic earnings.

A "D" rating, which the analysts assigned to all Internet companies including 24/7 and Interliant, denoted the highest level of risk. In addition to having all of the characteristics of a "C" issuer, "D" companies were so designated because of the analysts' opinion that the company's stock had a "high potential for price volatility." One or more of the following factors, among others, could have led to a company's receiving a "D" rating: untested management, lack of earnings history, or heavy dependence upon one product or service.

As noted above, the Investment Risk Rating for each stock was coupled with a pair of numbers. The two numbers, each a single digit between one and five, represented the analysts' opinions of the stock's Appreciation Potential. The first digit reflected the analyst's prediction of how the stock would perform over the short term, i.e., within 0–12 months, and the second digit represented the analyst's prediction of performance over the intermediate term, i.e., 12–24 months. The digits signified the following estimates:

1 BUY: Issue was considered to have particularly attractive potential for appreciation and was estimated to appreciate by 20% or more within the given time frame.

2 ACCUMULATE: Issue was considered to have attractive potential for appreciation and was estimated to appreciate by 10–20% within the given time frame.

3 NEUTRAL: Issue was considered to have *limited potential* for appreciation and was estimated to appreciate/decline by 10% or less within the given time frame.

4 REDUCE: Issue was considered too unattractive for appreciation and was estimated to decline by 10%–20% within the given time frame.

5 SELL: Issue was considered to be particularly unattractive for appreciation and was estimated to decline by 20% or more within the given time frame.

Thus, a rating of **D–1–2** meant that the stock at issue was highly volatile and *estimated* to appreciate by 20% or more within the immediately following 12 months and 10–20% for the 12 months following that (i.e. the period stretching 12–24 months after issuance of the report).

## I. PLEADING SECURITIES FRAUD

■ To recover damages in a private cause of action under Rule 10b–5, a plain-

tiff must plead and prove–among other elements–loss causation. "To establish loss causation a plaintiff must show[ ] that the economic harm that it suffered occurred as a result of the alleged misrepresentations." *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1495 (2d Cir.1992) (emphasis in original).

### 1. Loss causation is missing from plaintiffs' pleadings

"Loss causation developed exclusively out of case law and was never expressly recognized by the Supreme Court." [20] In the Private Securities Litigation Reform Act of 1995 (Reform Act),[21] however, Congress codified a uniform loss causation standard and made it applicable to all securities fraud suits of the kind presently before the Court. To cope with the the the scandals associated with such class suits, Congress enacted the so-called "Loss Causation" provision:

(4) Loss causation

In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.[22]

This was necessary in the Reform Act for the goal entitled in the legislation:

## TITLE 1–REDUCTION OF ABUSIVE LITIGATION

### SEC.101. PRIVATE SECURITIES LITIGATION REFORM.

■ Plaintiffs were explicitly reminded in this Court's Case Management Order No. 3, well prior to framing the allegations in the consolidated amended complaints, that they should give careful attention to pleading loss causation:

Consolidated amended complaints should also be carefully framed in order that they may fully comply with all applicable law regarding the pleading of loss causation.

Plaintiffs have failed to heed this reminder.

Plaintiffs claim in their brief that "[s]ome, and perhaps much, of the 'Internet bubble' was a classic stock market manipulation engineered by Wall Street's investment bankers and research analysts." [23] There is no factual predicate or legitimate inference from facts alleged in the consolidated complaint for plaintiffs' semantic invention of a stock market manipulation for internet company securities engineered by Wall Street's investment bankers and research analysts. Not even the freewheeling investigation and report make any such assertion or suggestion as a prop for its criticisms.

The cited alleged omissions of conflicts of interest could not have caused the loss of market value. The alleged omissions are not the 'legal cause' of the plaintiff's losses. There was no causal connection between the burst of the bubble and the alleged omissions; it was the burst which caused the market drop and the resultant losses a considerable time thereafter when plaintiffs decided it was time to sell. A defendant does not become an insurer against an intervening cause unrelated to the acquisition, e.g., a precipitous price decline caused by a market crash. The plaintiffs controlled their ultimate exit from the stocks after waiting no doubt for a market reversal.

---

**20.** David S. Escoffery, Note, A Winning Approach to Loss Causation Under Rule 10b–5 in Light of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 68 Fordham L.Rev. 1781, 1781 (2000).

**21.** 15 U.S.C. § 78u–4.

**22.** 15 U.S.C. § 78u–4(b)(4).

**23.** Opposition brief at p. 1.

There are simply no allegations in the complaints, much less particularized allegations of fact, from which this Court could conclude that it was foreseeable that the alleged non-disclosures of conflicts would cause the harm allegedly suffered by plaintiffs as a result of the bursting of the Internet bubble. Plaintiffs have also failed to allege facts which, if accepted as true, would establish that the decline in the prices of 24/7 and Interliant stock (their claimed losses) was caused by any or all of the alleged omissions from the analyst reports.

Moreover, none of the Second Circuit cases upon which plaintiffs rely have applied the so-called "disparity of investment quality" or "price inflation" theory of pleading loss causation to a putative securities class action in which the plaintiffs sought to utilize the fraud on the market theory. Rather, each involved a face-to-face transaction in which the identified plaintiffs alleged that they actually detrimentally relied on defendants' misrepresentations and that they were harmed as a result. For sound policy reasons discussed below, plaintiffs' theory on loss causation should not be expanded to fraud on the market cases, where reliance is presumed (if certain criteria are met) based upon the assumption that in an efficient market "most publicly available information is reflected in market price, [and] an investor's reliance on any public material misrepresentation, therefore, may be presumed." *Basic v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).[24] In the circumstances here presented, the sound reasoning of the Eleventh Circuit Court of Appeals in *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir.1997), should be applied. There, the court observed that in a fraud on the market putative class action, price inflation is typically used as a surrogate for reliance and the closely related concept of *transaction* causation. After examining the concept of proximate causation carefully, the court reasoned that price inflation should not be extended to satisfy the independent requirement to plead *loss* causation:

> Our cases have not utilized the [fraud on the market] theory to alter the loss causation requirement, and we refuse to do so here. Our decisions explicitly require proof of a causal connection between the misrepresentation and the investment's *subsequent decline in value.*

*Robbins,* 116 F.3d at 1448 (emphasis added).

Accordingly, the court stated that in the circumstances presented, the "showing of price inflation, however, does not satisfy the loss causation requirement" and would otherwise collapse transaction and loss causation, *see id.,* a result which even plaintiffs acknowledge would be at odds with Second Circuit law.

Even if there was a claim that the misconduct caused the purchase price of the stocks to be artificially inflated, plaintiffs have failed to allege facts (as opposed to legal conclusions) from which to infer that the alleged omissions were a substantial cause of any inflation. In their memorandum, plaintiffs refer to only eight of the over eighty research reports issued by Merrill Lynch on 24/7 and Interliant during the putative class periods and allege that the respective stock prices rose in the days following the issuance of the research reports. Yet despite instances thereafter when prices dropped following reports, plaintiffs make no attempt in their pleadings to allege facts that would support their conclusion that any minor increases were caused by an analyst's rating as op-

---

**24.** As noted in Merrill Lynch's opening brief, plaintiffs allege that the fraud on the market theory applies in this case and that allegation is accepted as true solely for purposes of this motion.

posed to the numerous other factors, including previously non-public internal financial information released at virtually the same time by the companies themselves (or elsewhere in the analysts' reports), or even the effect of reports issued by other analysts.

### (a) Merely Alleging "Artificial Inflation" is Not Sufficient To Satisfy Loss Causation

 Causation under federal securities laws "is two pronged: a plaintiff must allege both transaction causation ... *and loss causation ....*" *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001) (emphasis added). The loss causation inquiry must examine "how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement." *Id.* at 96 (*citing First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994)). As explained in *AUSA Life Insurance Co. v. Ernst & Young,* the "foreseeability query" is whether the defendant could have reasonably foreseen that its alleged misconduct could lead to the financial decline of the investments which led to the harm to the investors. *See AUSA,* 206 F.3d 202, 217 (2d Cir.2000) ("The foreseeability query is whether E & Y could have reasonably foreseen that their certification of false financial information could lead to the demise of JWP, by enabling JWP to make an acquisition that otherwise would have been subjected to higher scrutiny, which led to harm to the investors.").

Here, to the contrary, plaintiffs have not alleged that there was any link between the allegedly overly optimistic ratings and the financial troubles of 24/7 or Interliant that led to their financial demise in the wake of the bursting bubble, nor any facts demonstrating that they were the cause.[25] Nor do plaintiffs allege facts demonstrating that it was foreseeable that the allegedly overly optimistic ratings would lead to the financial demise of 24/7 or Interliant.

### (b) The Burst of the Bubble – Intervening Cause

The Second Circuit has also continued to stress the need to examine whether intervening causes are present and the lapse of time between the fraudulent statement and the loss. Both of these elements focus on conduct occurring *after* the investment decision and *after* the purchase of shares at the allegedly inflated price. For example, the Second Circuit reiterated in *Castellano v. Young & Rubicam, Inc.* that "'when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions.'" 257 F.3d 171, 189

---

**25.** In contrast to the allegations here, in *WorldCom* the plaintiffs alleged that the analyst, among other things, was aware of and concealed the alleged accounting irregularities that directly led to the losses incurred by plaintiffs. Also, unlike here, plaintiffs alleged in *WorldCom* that the research reports were materially false and misleading because the analyst had failed to disclose material non-public information he possessed about the company and had purportedly concealed the company's true financial condition by employing a valuation model not used for any other company to allegedly disguise various aspects of the company's alleged "capital expenditure fraud." *See In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), 2003 WL 21219049, at *9, *29 (S.D.N.Y. May 19, 2003). The *WorldCom* plaintiffs additionally alleged various undisclosed financial arrangements between the issuer and the analyst's firm. *See id.* at *10, *29–30. The complaints at issue here allege neither that Merrill Lynch possessed material nonpublic information regarding the financial condition of 24/7 or Interliant, nor the existence of any such undisclosed financial arrangements. The Court respectfully submits that the *WorldCom* decision is not broad enough to cover the allegations here.

(2d Cir.2001) (citing *First Nationwide,* 27 F.3d at 769); *see also Suez Equity,* 250 F.3d at 96. As the Second Circuit explained:

> The cases where we have held that intervening direct causes preclude a finding of loss causation present facts sharply different from those at issue here [in *Castellano* ]. *See Powers [v. British Vita,* 57 F.3d 176, 189 (2d Cir.1995) ] (market value of stock fell as a result of recession); [*First Nationwide* ], 27 F.3d at 772 (investor's loss caused by marketwide real estate crash); *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992) (loss to plaintiff from loans made on the basis of fraudulent misrepresentation were the result of a decline in value of collateral unrelated to the fraud); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62 (2d Cir.1985) (loss caused not by misrepresentations in various documents used to attract investments but by looting and mismanagement of these funds by controlling stockholders).

*Castellano,* 257 F.3d at 189–90. These cases distinguished by *Castellano* are plainly applicable to the facts here where the overall Internet market had collapsed – causing the price of 24/7 and Interliant to decline dramatically – and where plaintiffs cannot allege a factual link between that decline and defendants' conduct. Yet if merely alleging artificial inflation was sufficient, then there would be no need for any of these cases to discuss the importance of considering whether there was the presence of any intervening factors.

Indeed, the Second Circuit has held that "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases." *First Nationwide,* 27 F.3d at 772 (citing *Bastian v. Petren Res. Corp.,* 892 F.2d 680, 684 (7th Cir.1990)). Yet, plaintiffs' allegations utterly fail to take into account the intervening cause of the Internet market collapse.[26]

### (c) Disparity in Price Theory is Inapplicable

Unlike the instant case, the Second Circuit cases upon which plaintiffs rely all involved face-to-face transactions and allegations of direct reliance on the allegedly false or misleading information.

"[T]he fraud on the market theory, as articulated by the Supreme Court, is used as a rebuttable presumption of reliance, not a presumption of causation." *See Robbins v. Kroger Props. Inc.,* 116 F.3d at 1448 (citing *Basic,* 485 U.S. at 241–42, 108 S.Ct. 978). To permit plaintiffs to allege artificial inflation through the fraud on the market theory to satisfy loss causation would improperly conflate both the "but for" transaction causation and the loss causation elements into one. The Eleventh Circuit in *Robbins* expressly rejected such an approach.

In *Robbins,* plaintiffs argued that the false financial statements misled investors about the ability of the issuer to sustain its high dividend level and, thereby, maintain an artificially inflated stock price. As evidence of the price inflation, plaintiffs alleged that "an adjustment in the stated amount of cash flow in July 1989, the beginning of the class period, would have required KPI to cut or eliminate its divi-

---

**26.** In an attempt to distinguish *First Nationwide,* plaintiffs cite *AUSA,* for the uncontroverted proposition that *First Nationwide* "did not intend to bar a plaintiff from successfully pleading 'proximate cause when the claim follows a market collapse.' " Defendants did not argue that one could never plead proximate cause following a market collapse, but that plaintiffs have not done so.

dend, causing a $10.05 decline in KPI's stock price like the decline that occurred in October 1990." *Robbins*, 116 F.3d at 1446–47.

The Eleventh Circuit found that this was not enough to satisfy the loss causation requirement. *See id.*, 116 F.3d at 1448. The *Robbins* court concluded that the plaintiffs' actual loss was due to the decline in the price of their stock, which was caused by the company's cut in its dividend and not the fraudulent financial statements. The Eleventh Circuit rejected plaintiffs' attempt to satisfy loss causation by alleging, through the fraud on market theory, simply that the price was artificially inflated:

> But the fraud on the market theory, as articulated by the Supreme Court, is used to support a rebuttable presumption of reliance, not a presumption of causation. *See Basic v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194, (1988) ("Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action."). The theory was used for this purpose by the

plaintiffs in this case. Because the theory supports a presumption of reliance, it is more closely related to the transaction causation requirement. Our cases have not utilized the theory to alter the loss causation requirement, and we refuse to do so here. Our decisions explicitly require proof of a causal connection between the misrepresentation and the investment's subsequent decline in value. *Robbins*, 116 F.3d at 1448.

Plaintiffs' assertion that "[t]he *Suez Equity* test applied the fraud on the market theory to loss causation" is not correct. *Suez Equity* involved a claim of actual reliance in a face-to-face transaction and did *not* involve publicly traded securities or the fraud on the market theory.[27] On the other hand, in *Rothman v. Gregor*, 220 F.3d 81 (2d Cir.2000), cited by plaintiffs, the Second Circuit analyzed loss causation in a fraud on the market case and examined whether the defendant could reasonably foresee that its alleged fraudulent failure to expense "would lead to a drop in GT's stock price." *Id.* at 95. Thus, the Second Circuit looked to whether that alleged misconduct caused the price to drop and did not analyze loss causation in terms of artificial inflation.[28]

**27.** Plaintiffs also cite to footnote 145 in Judge Scheindlin's over 100–page decision in *In re Initial Public Offering Securities Litigation*, 241 F.Supp.2d 281 (S.D.N.Y.2003). Judge Scheindlin recognized in the same footnote 145 that "[a]lthough the Second Circuit has never explicitly stated it that way; other circuits have." 241 F.Supp.2d at 377–78 n. 145. The other circuit decision upon which she relied was the Ninth Circuit's decision in *Knapp v. Ernst & Whinney*, 90 F.3d 1431 (9th Cir.1996), *see Robbins*, 116 F.3d at 1448, in which the Ninth Circuit collapsed transaction and loss causation and with which *Robbins* explicitly disagreed.

**28.** Allowing plaintiffs in a fraud on the market case to satisfy loss causation simply by alleging that a misrepresentation caused the price to be artificially inflated without having

to allege any link between the conduct and a decline in price would undoubtedly lead to speculative claims and procedural intractibility. After any drop in price – even if, as here, it is entirely unrelated to defendant's conduct – a subsequently dissatisfied investor would be able (with the benefit of hindsight) to point to any allegedly misleading positive statement issued by anyone (not just the issuer) and couple that with an allegation that the price of the security was inflated as a result to satisfy loss causation. To allow such a claim would invite self-serving testimony, strike suits and protracted discovery. "The issues would be hazy, the[] litigation protracted, and the[ ] resolution unreliable." *Grace v. Rosenstock*, 228 F.3d 40, 48 (2d Cir. 2000). The Second Circuit has held that it "would reject any theory of causation that raised such prospects." *Id.* (affirming dis-

Plaintiffs' extensive reliance on *Marbury Management* is also misplaced. As Judge Jacobs explained in his concurrence in *AUSA:*

> In that case, the compelling facts were that Alfred Kohn, a broker-trainee but not yet a broker, repeatedly told the customers that he was a broker. *See id.* at 707. Believing that Kohn was a broker, the plaintiffs bought and held securities on his recommendation, only to incur losses on their purchases. *See id.* It was clear that if the plaintiffs had known what was concealed–that broker-trainee′ Kohn was not the licensed broker he claimed to be–they would have declined to purchase the securities recommended by Kohn, and certainly would have sold the securities when they began to lose value: "Kohn's statements by their nature induced both the purchase and the retention of the securities, the expertise implicit in Kohn's supposed status *overcoming plaintiffs' misgivings prompted by the market behavior of the securities."* *Marbury Management,* 629 F.2d at 708 n. 2 (emphasis added).

> Though one can debate whether the circumstances that were said to be loss causation in *Marbury* amount to anything more than transaction causation, *Marbury* does not purport to change the rule–which we have consistently applied before and since–that a 10(b) claim cannot succeed unless loss causation is demonstrated.

*AUSA,* 206 F.3d at 227 (Jacobs, J., concurring).

In short, *Marbury Management* is a unique fact pattern involving allegations of a direct misrepresentation and actual reliance and should not be extended to the allegations here, especially where plaintiffs here invoke the presumptions of fraud on the market theory. As Judge Meskill noted in his eloquent dissent there, the majority "strain[ed] to reach a sympathetic result" and improperly extended the reach of Section 10(b) even in a face-to-face transaction. *See Marbury,* 629 F.2d at 716–17 (Meskill, J., dissenting). Similarly, Judge Jacobs, in his concurrence in *AUSA,* also warned that "it would be a mistake to treat the *Marbury* facts as a template for loss causation;" that its holding should be limited to "the same set of facts;" and the Second Circuit "has never read *Marbury* to hold that transaction causation subsumes loss causation." *AUSA,* 206 F.3d at 227.

Since *Suez Equity,* courts in this district have rejected bare allegations that the misconduct alleged induced a disparity between the transaction price and "true investment quality" in the absence of specific facts connecting plaintiffs' losses to the misrepresentation alleged. *See Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.,* 02 Civ. 1276(PKL), 2003 WL 169801, at *21 (S.D.N.Y. Jan. 24, 2003) (Leisure, J.); *see also Greenwald v. Orb Communications & Mktg., Inc.,* No. 00 Civ.1939 (LTS HBP), 2003 WL 660844, at *2 (S.D.N.Y. Feb. 27, 2003) (Swain, J.) (denying motion for reconsideration, rejecting plaintiff's contention that under *Castellano,* he had sufficiently alleged loss causation because he alleged " 'that defendant's misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of the transaction' ") (quoting *Castellano,* 257 F.3d at 188). Judge Sweet's decision in *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 195 F.Supp.2d 551, 559–60 (S.D.N.Y.2002), did not change his original analysis in his first decision dismissing the complaint for failing to allege loss causation even where defendants were alleged to have contribut-

missal after trial of section 10(b) claims on loss causation grounds).

ed to the bubble. *See Emergent*, 165 F.Supp.2d 615 (S.D.N.Y.2001). In the second decision, Judge Sweet still dismissed the complaint on other grounds, but found in *dicta* that – unlike here – plaintiffs amended their complaint to add specific allegations (not present here) that defendants in a face-to-face transaction made misrepresentations concerning non-public information about the qualifications and background of an insider to satisfy their burden of pleading loss causation. *See Emergent Capital Inv. Mgmt.*, 195 F.Supp.2d 551.

By citing just eight reports, plaintiffs apparently are conceding that they have not alleged that any of the other over 75 research reports substantially caused any artificial inflation.[29]

Plaintiffs make no attempt to address any of the concerns raised in *First Nationwide*, in terms of alleging that it was actually the alleged optimistic ratings – as opposed to other external factors – that was a substantial cause of the artificial inflation. For example, plaintiffs do not address that these eight research reports were issued on the same day that the issuer announced positive news (previously nonpublic information) about itself. (*See, e.g.*, Musoff Decl. Ex. 1, Comment dated Aug. 12 1999, at 1 ("24/7 Media reported a

very strong Q2.... Q2 revenues increased 50% sequentially to $17.2 million...."); Ex.2. Bulletin dated Nov. 17, 1999 at 1 ("Interliant announced the acquisition of Triumph Technologies, a private Internet security firm.").)

Plaintiffs also do not bother to differentiate between the ratings and the rest of the information in the research reports. These research reports themselves contained not only the issuers' news, but also a host of other factual information which is not being challenged here. (*See, e.g.*, Musoff Decl. Ex. 1, Comment dated Dec. 9, 1999, at 1 ("24/7 Media announced that its email division has increased its total number of opt-in email names to 15.5mm, up from 13mm at the end of Q3."); Ex. 2, Bulletin dated Feb. 1, 2000, at 1 ("Interliant preannounced 4Q99 results, ahead of expectations. Revenues of $18 million were 12% ahead of our $16.1 million estimate.").)[30]

### 2. Plaintiffs fail to plead fraud with particularity

When, as here, a complaint contains allegations of fraud, Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting fraud ... be stated with particularity." The Second Circuit has interpreted this language to mean

---

**29.** Under plaintiffs' theory, they must allege that each of the challenged ratings was the substantial cause of artificial inflation. Plaintiffs' complaints challenge every report over an approximate two-year period, yet there are no other allegations of loss causation regarding the other research reports. Furthermore, the lead and named plaintiffs do not allege that their losses are even linked to the inflation allegedly caused by any of these eight specified reports. For example, not one of the named plaintiffs purchased shares within the same month of any of these eight reports. (*Compare* Interliant Plaintiffs and 24/7 Plaintiff Certifications, *with* Pls. Mem. at 30.)

**30.** In an attempt to overcome these defects, plaintiffs cite in their complaints several arti-

cles which discuss Mr. Blodget's alleged influence on the market. As an initial matter, these articles cannot replace allegations of actual artificial inflation. None of these articles ever state that it is the ratings, as opposed to his analysis in the research reports of the financial information provided by the company, that allegedly caused his influence. More significantly, none of the articles state that he had any impact on the price of 24/7 or Interliant. Indeed, as the analyst reports about which plaintiffs complain themselves reflect, Mr. Blodget did not even cover Interliant after February 2000, yet the putative class period runs until February 2001.

that, in the securities fraud context, "the actual fraudulent *statements or conduct* and the fraud alleged *must be stated with particularity* ...."[31] The Second Circuit has held that, at a minimum, the complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent–specifying who made them and where and when they were made.[32] This heightened particularity standard is reinforced by the Reform Act, in which Congress required that plaintiffs alleging material misrepresentations or omissions must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."[33]

### (a) Plaintiffs fail to identify the precise misrepresentations and omissions alleged in 24/7 and Interliant

As noted above, plaintiffs must allege *with particularity*, and not in general terms, the statements or omissions that they contend were fraudulent, as well as the fraud itself.[34] It has not been an easy task to comb through the two prolix and unnecessarily repetitive complaints–each of which is 68 pages in length and lists over 180 numbered paragraphs containing much in the way of speculation and news reports–in search of precisely *what* the plaintiffs actually allege was materially misrepresented or omitted by defendants.[35] Indeed, there seems to be not

insignificant grounds for finding the complaints in violation of Rules 8(a)(2) & (e)(2) of the Federal Rules of Civil Procedure. Defendants have moved to strike, and not without reasonable basis, paragraphs 13–18, 32, 36–37, 59–60, 62–64, 66–73, 82, 87–91, and 96–100 of the 24/7 complaint and paragraphs 4–9, 38–39, 61–62, 64–66, 68–74, 82, 87–91, and 96–100 of the Interliant complaint as immaterial under Rule 12(f). Given that more than a dozen plaintiffs' firms had already had the benefit of nearly a year from the publication of the Dinallo affidavit in which to sharpen their allegations and hone their complaints,[36] the Court had ample reason to consider, and did consider, simply dismissing the consolidated amended complaints outright–with leave to re-plead again, this time in full compliance with the aforementioned Rules. This course of action would have laid the pleading burden squarely back where it belonged–with plaintiffs' counsel–and would have, hopefully, resulted in a set of complaints that was more manageable and more in compliance with the Rules.

Willing to give plaintiffs every benefit of any doubt, however, and attempting to keep delays, costs and attorneys' fees at reasonable levels, and mindful of its obligation to construe pleadings so as to do substantial justice,[37] the Court instead decided to shoulder, itself, the burden of threshing all of the chaff in search of any

---

**31.** *Chill v. General Electric Co.,* 101 F.3d 263, 267 (2d Cir.1996) *(citing Gold v. Morrison–Knudsen Co.,* 68 F.3d 1475, 1476–77 (2d Cir. 1995); *Acito v. IMCERA Grp., Inc.,* 47 F.3d 47, 51 (2d Cir.1995); *Cohen v. Koenig,* 25 F.3d 1168, 1173 (2d Cir.1994)) (underlined emphasis supplied).

**32.** *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993).

**33.** 15 U.S.C. § 78u–4(b)(1).

**34.** *See supra* notes 31–32 and accompanying text.

**35.** The other 25–odd consolidated amended complaints are similarly verbose.

**36.** The consolidated amended complaints were due March 14, 2003; twelve plaintiffs' firms shared the drafting responsibilities as lead counsel on various consolidated actions, with support from other firms.

**37.** *See* Fed. R. Civ. P. 8(f).

kernels that might emerge from the complaints.

■ After reading through many pages of allegations that are not always linked with the tightest of logical rigor, a reader of the 24/7 complaint comes upon the tersest statement of the material misstatement/omission claim. In substance, the claim is as follows (bold emphasis supplied):

"Defendants' misrepresentations and omissions **concerned**, *inter alia* . . . the fact that . . . :"

(1) "[T]he [research reports'] ratings **in many cases** did not reflect the analysts' true opinions of the companies, including 24/7 Media."

(2) "[A]s a matter of **undisclosed**, internal policy, no 'reduce' or 'sell' recommendations were issued, thereby converting a published five-point rating scale into a *de facto* three-point system."

(3) "[Defendants] failed to disclose that Merrill Lynch's ratings were **tarnished** by an **undisclosed** conflict of interest in that the research analysts were acting as quasi-investment bankers for the companies at issue, often initiating, continuing, and/or manipulating research coverage for the purpose of attracting and keeping **investment banking clients**, thereby producing **misleading ratings** that were neither objective nor independent, as they purported to be."

(4) "[Defendants] failed to comply with the rules and regulations of the SEC, NASD and other regulatory authorities regarding communications to the investing public." [38]

Plaintiffs are tarring with a broad brush here—the very action prohibited by, among other things, Rule 9(b) and the Reform Act, as set forth in detail above.[39] These provisions mandate a school of realism, not impressionism. Plaintiffs must set forth *with particularity each* statement they assert was fraudulent and why, in their view, the statement was fraudulent–specifying who made it and where and when it was made.[40] Moreover, the Reform Act mandates that plaintiffs specifically identify *"each statement"* alleged to be misleading *and* the reason or reasons why it is misleading.[41]

The complaints fail to meet those standards here. For example, in paragraph (1) above, the complaint alleges in a very generalized fashion that certain unspecified misrepresentations (plural) "concerned" various and sundry "ratings" that "in many cases" (it is not alleged how many) did not reflect "the analysts'" opinions of "the companies," "including 24/7 Media." The specifics, which must be alleged if the claims are to meet the particularity standards of Rule 9(b) and the Reform Act, are hidden from view. Nowhere here is it alleged with particularity which statements–i.e. specifically *which* statements in specifically *which* of the *forty-four* 24/7 research reports published during the class period–carried "not true" opinions, or how these "misrepresentations" (plural) "concerned" the various "companies," or any of the specific facts

---

**38.** 24/7 Compl. ¶ 173. The Interliant complaint (at ¶ 173) contains virtually identical, word-for-word allegations. For this reason, the ensuing analysis applies to the Interliant complaint with equal force.

**39.** See supra notes 7–8, 31–33 and accompanying text.

**40.** See supra notes 7, 31–32 and accompanying text.

**41.** See supra notes 8, 33 and accompanying text.

upon which the belief that the opinions (whichever ones are meant) were false is based, or precisely when or where the statements were made (i.e. again, specifically which statements, in specifically which of the 24/7 research reports, released at specifically which times). The absence of these particularized allegations is all the more telling given that plaintiffs had eleven months of access to the Dinallo affidavit (and other materials), which collected and quoted portions of the then–30,000–document, 100,000–page, 20–deposition, "thousands-of-emails" *ex parte* regulatory investigation.[42] The fact that plaintiffs apparently could find *nothing more* tangible and specific to allege about the 24/7 reports from this voluminous windfall of material (*i.e.*, nothing more specific to bolster the allegations in the paragraphs noted above)–and most securities fraud plaintiffs have much less material to draw upon–is an early signal that the complaints are straining to meet the pleading burden.

A close examination of the allegations set forth in paragraphs (2), (3), and (4) above yields similar results. Although plaintiffs do not specify whether paragraphs (2), (3), and (4) concern omissions or affirmative misrepresentations, and do not specifically identify the omissions or affirmative misrepresentations in any event, the Court, attempting to give the fairest reading possible, interprets the allegations in paragraphs (2), (3), and (4) to involve omissions (and not affirmative misrepresentations), whose specificity unfortunately must be gleaned and stitched together laboriously from disparate elements of the preceding 172 paragraphs of the complaint–a task that plaintiffs were under an obligation to do themselves.

For now, it should be noted that, as in paragraph (1), the allegations in paragraphs (2), (3), and (4) fail to meet the applicable particularity standards. The claims are dotted with generalities. First, the allegations in paragraphs (2) through (4) do not specify which of the two categories–affirmative misrepresentations or omissions–are involved. Second, assuming that omissions are what are characterized here, plaintiffs fail to specify the reason or reasons *why* the existence of the omissions meant that the research reports (and again, it is not alleged which of the forty-four 24/7 research reports are involved) were misleading.[43] Nowhere in these paragraphs is it specifically alleged precisely *which* analysts had *which* conflicts of interest involving *which* investment banking deals leading to *which* 24/7 research reports being misleading, to what degree, and when. Instead the complaints allege that "analysts" (in general) were "often" (no specifics) "initiating, continuing and/or manipulating" (note the vague catchall conjunction "and/or") "research coverage" (in general), producing generally "misleading ratings" (no specifics or reasons given) that were generally "tarnished" (plaintiffs should allege whether "tarnished" encompasses "materially misleading," and if so, how)–all in order to attract and keep various unnamed and unspecified investment banking "clients." The extensive use of generalized plural nouns ("misrepresentations and omissions," "clients," "ratings," "rules and regulations," "analysts," "opinions," "companies," "quasi-investment bankers"), combined with the use of vague modifiers ("often," "concerning," "in many cases," "and/or," "*inter alia*") and a marked absence of named particulars–are a dead giveaway that the complaints are skirting the pleading requirements imposed by

---

**42.** Dinallo affidavit at p. 2.

**43.** See supra notes 7–8, 31–33 and accompanying text for the applicable legal requirements.

Rule 9(b), the Reform Act, and the law of the Circuit.

In sum, Rule 8(a)(2) requires that complaints contain a *"short and plain* statement of the claim showing that the pleader is entitled to relief" (emphasis supplied). In each of the complaints at bar, however, the statement of the claim appears to be scattered throughout a voluminous 68–page document. Moreover, as shown in the discussion above, even in the paragraphs in which the complaints finally set forth the claims in something other than verbose terms, the allegations turn out to be vague and elusive.

Plaintiffs were explicitly reminded in Case Management Order No. 3, well prior to the filing of their consolidated amended complaints, that they should take special care to comply with the particularized pleading requirements:

> *Each counsel who has been appointed Lead Counsel in a particular consolidated action is responsible for obtaining the necessary information such that the consolidated amended complaint filed for that case will comply with the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, in particular 15 U.S.C. § 78u–4(b)(1) & (2). The factual allegations must be specific to the security in question and should clearly allege who said what to whom concerning that particular security.*

Plaintiffs have failed to heed this reminder, making it very difficult for a court to make the necessary analysis of, among other things, the *materiality* (which necessarily depends on all relevant circumstances and the total mix of information available to the reasonable investor at the time of each alleged misrepresentation or omission) of the alleged misrepresentations and omissions.

### (b) Plaintiffs Fail To Address the Pleading Requirements Applicable to Statements of Opinion

■ Plaintiffs do not dispute that under *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1095–96, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), the only challenge that may be made to a statement of opinion is that the speaker did not actually hold the opinion; undisclosed motivations are not actionable. Indeed, plaintiffs fail to even mention the Supreme Court decision in their papers. Plaintiffs effectively also concede that for pleading purposes, they must allege particular facts, *for each and every rating challenged,* that Merrill Lynch and Mr. Blodget did not hold the opinion or had no reasonable basis for believing the opinion.[44] (Pls. Mem. at 69–70.) Yet they assert, without any citation to authority, that the alleged subjective motive to garner investment banking fees from 24/7 and Interliant provides such a basis. (Pls. Mem. at 72–73.) Because, as plaintiffs concede, the ratings are beliefs or opinions (Pls. Mem. at 40–42), plaintiffs' theory is not legally viable. *See Bond Opportunity Fund,* No. 99 Civ. 11074(JSM), 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003) (plaintiff must allege speaker "did not actually hold the belief or opinion stated, *and* that the opinion stated was in fact incorrect" (citing

---

**44.** Although they set up a strawman argument Merrill Lynch never made—that "statements of opinion are not actionable"—plaintiffs note that statements of opinion may be actionable if they " 'are supported by specific statements of fact [that are false], or if the speaker does not genuinely or reasonably believe them.' " (Pls. Mem. at 41 (quoting *In re IBM Corp. Sec.*

*Litig.,* 163 F.3d 102, 107 (2d Cir.1998)).) Although plaintiffs conclusorily allege that defendants "did not genuinely or reasonably believe [the ratings]" (Pls. Mem. at 46–47), they do not allege contemporaneous facts to show the falsity of each and every research report according to this standard.

*Virginia Bankshares,* 501 U.S. at 1093–98, 111 S.Ct. 2749)).[45]

Allegations regarding the motivation to attract investment banking business are not specific contemporaneous data or information inconsistent with the opinions. *See In re IBM Sec. Litig.,* 163 F.3d at 107; *Faulkner,* 156 F.Supp.2d at 397–99.[46] Although plaintiffs acknowledge that *Faulkner* and *IBM* set forth the standards applicable to pleading a claim based upon an allegedly false statement of opinion (Pls. Mem. at 40–41 & n. 33), plaintiffs protest that the standards are unreasonable and essentially ask the Court to ignore them. (Pls. Mem. at 71.)[47] Without any citation to authority, plaintiffs assert that pleading "facts" relating to defendants' alleged motives to issue the reports are sufficient to plead that each particular rating was false. (*Id.*)

Plaintiffs confuse the inquiry as to whether they have pled facts with respect to motive and opportunity as it relates to the defendants' state of mind, *see* 15 U.S.C. § 78u4(b)(2), with the inquiry as to whether plaintiffs have sufficiently alleged

that defendants made materially false statements, *see* 15 U.S.C. § 78u–4(b)(1). These are independent pleading requirements and the pleading of a motive to issue false statements does not establish that false statements were in fact issued. *Cf. San Leandro,* 75 F.3d at 813 ("Since plaintiffs have not alleged circumstances indicating that any of the statements identified in the Complaint were false, the plaintiffs have failed to adequately plead fraud.") (citing *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995)). In this case, the pleading of a false statement does not "dovetail" with scienter as plaintiffs assert. (Pls. Mem. at 71.) Just last month, Judge Martin dismissed a complaint alleging a violation of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), challenging statements of opinion in a proxy statement, holding that "absent impermissible speculation and extensive extrapolation as to defendants' purposes and motives, plaintiffs [had] not set forth sufficient facts" supporting plaintiffs' allegations that the proxy statements were false and misleading. *Bond Opportunity Fund,* 2003 WL 21058251, at *5.[48]

---

**45.** Plaintiffs allege that the Dinallo Affidavit "established" that "[all] Analyst Reports that Merrill Lynch issued on Internet companies were false and misleading because the opinions ... were *not necessarily* ... true." (24/7 Compl. ¶ 17; Interliant Compl. ¶ 8). It is not enough, however, to allege that statements "might have" been false.

**46.** *See also Rodman v. Grant Found.,* 608 F.2d 64, 71 (2d Cir.1979) ("[T]he directors were not required to put forth in the proxy materials an analysis of their otherwise obvious interest in company control."); *Lewis v. Oppenheimer & Co.,* 481 F.Supp. 1199, 1204 (S.D.N.Y.1979) (Pollack, J.) (stating that it is "well-established" that the securities laws are not concerned with "actual subjective motives," provided the "relevant underlying facts" are disclosed).

**47.** Even plaintiffs' cases require that such a complaint allege with particularity knowledge

of facts undermining defendants' statements or facts showing that defendants had no reasonable basis for the opinion expressed. *See, e.g., In re Nortel Networks Sec. Litig.,* 238 F.Supp.2d 613, 627–28 (S.D.N.Y.2003) (Berman, J.) (soft opinions sufficiently alleged to be false where plaintiffs pleaded specific facts to show that defendants could not possibly have believed opinion at time it was made); *Gabriel Capital, LP v. NatWest Fin., Inc.,* 122 F.Supp.2d 407, 416, 419 (S.D.N.Y.2000) (Scheindlin, J.) (plaintiffs adequately alleged statement not reasonably believed where defendant stated that mill was "first class" despite allegations that it had not verified design or operating assumptions and had repeatedly expressed "serious concerns" about it) (Pls. Mem. at 41–42).

**48.** Plaintiffs' reliance on *Rothman v. Gregor,* 220 F.3d 81 (2d Cir.2000) for the proposition that their allegations of falsity "satisfy the relevant pleading standard," is misplaced.

Because the issues of alleged "conflicts" and lack of sell ratings are irrelevant to the determination of whether the ratings were genuinely held beliefs, plaintiffs are left with just the e-mails. However, e-mails concerning securities other than 24/7 and Interliant fail to meet the Rule 9(b) (let alone the PSLRA) pleading requirements necessary to allege that Merrill Lynch made fraudulent statements in reports concerning 24/7 or Interliant. In *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003–04 (2d Cir.1988), the Second Circuit rejected plaintiff's reliance on other instances in which "[defendant] assertedly obtained greenmail from other corporate targets" as insufficient under Rule 9(b) to support plaintiffs' allegations that the defendants' public filings in connection with yet another unconsummated merger were fraudulent because they, too, were allegedly part of defendants' alleged scheme to extract "greenmail" from the current failed merger candidate. *See id.* at 1003–04. "It is not enough to quote press speculation

about defendants' motives and press reports of other occasions on which [defendant] assertedly obtained greenmail from other corporate targets.... Such allegations simply do not provide ... 'specific, well-pleaded facts'...." *Id.* at 1004.[49]

Moreover, the characterizations of snippets of e-mails and conclusions of the New York Attorney General,[50] submitted in a regulatory proceeding for an *ex parte* injunction, in addition to failing to constitute well-pleaded facts, are improperly included in plaintiffs' complaints.[51] Although plaintiffs assert that Merrill Lynch's motion to strike is "frivolous" (Pls. Mem. at 1 n. 2), and "should simply not be considered at this stage of the proceedings" (Pls. Mem. at 57 n. 50), plaintiffs fail to address, let alone distinguish, *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 892–94 (2d Cir.1976).

Without the legal conclusions of the Dinallo Affidavit and the e-mails concerning securities other than Interliant, the Interli-

---

There, the accounting violation alleged required knowledge that particular capital expenditures would not be recovered through future sales, *i.e.,* that write-offs were required, and plaintiffs alleged particular facts to support the allegation that the directors knew that the writeoffs would be necessary, but allowed the assets to remain on the books. *See id.* at 89–92. The court noted that the allegations supporting scienter, *i.e.,* that defendants knew or had concluded that they could not recoup the advances through future sales "essentially combines the misrepresentation and scienter inquiries." *Id.* at 90. *Rothman* certainly does not support plaintiffs' position here that by pleading a motive to issue false statements that they also have satisfied their burden to plead the falsity of the statement.

**49.** *See also, e.g., W.E. Darin Constr. Enters. v. Detroit Coke Co.,* 814 F.Supp. 325, 331 (W.D.N.Y.1993) ("Other conclusory allegations in the complaint involving the relationships between McNamara and the other named Defendants, and unsubstantiated alle-

gations that at least twelve other contractors have fallen victim to the same scheme, do not provide a factual basis for the inference that those Defendants used wires and mails 'for the purposes of executing such scheme or artifice ....' " (citation omitted)).

**50.** Without attempting to supply the context, plaintiffs quote the Dinallo Affidavit's characterization of an excerpt of an e-mail (which also omits the communications to which Mr. Blodget was responding) as "evidenc[ing] [that] ... the treatment of Aether Systems" supports the conclusion that "the Internet Group rarely issued Analyst Reports that reflected their true opinions and were issued as part of the overall scheme to attract investment banking business." (24/7 Compl. ¶ 89; Interliant Compl. ¶ 89.) The 24/7 and Interliant complaints fail to explain how this e-mail renders any—let alone all—"Analyst Reports" on 24/7 or Interliant false and misleading.

**51.** *See Senders v. Morgan Stanley Dean Witter & Co.,* 01 Civ. 7621(MP), 2001 WL 958927, at *1 (S.D.N.Y. Aug. 21, 2001) (the views of

ant plaintiffs have no e-mails or any other contemporaneous facts concerning Interliant to attempt to explain why any rating on Interliant was not actually and reasonably believed at the time it was issued.[52] This obviously does not meet the requirements of the Reform Act and Rule 9(b) to show that the analyst did not believe any particular rating.

The 24/7 plaintiffs do not fare any better. They cite two e-mails relating to 24/7, one dated March 6, 2000 and one dated October 10, 2000, but fail to explain why either of these e-mails renders any contemporaneous rating or report false. *See, e.g., Duncan v. Pencer*, No. 94 Civ. 0321, 1996 WL 19043, at *8 (S.D.N.Y. Jan. 18, 1996) (Preska, J.) (conducting statement by statement analysis and dismissing claims as to 27 of 30 statements).[53] Moreover, their complaint cannot possibly state claims with respect to opinions issued *before* March 6, 2000.

### 3. The Alleged Omissions Were Not a "Fraud on the Market"

■ The market could not have been defrauded by the alleged failure to disclose the conflicts or the supposed three-point rating system. Plaintiffs' own allegations and the articles upon which they rely evidence that the market was apprised of the very conflicts and ratings issues raised by them. The ratings and conflicts for all of the securities were known to the market and were specifically disclosed in the Sector Reports. *See* Musoff Decl. Exs. 1, 7, 8 (Internet Sector; Reset of Sector Ratings, August 7, 2000, at 2.); *see also, e.g.,* Ex. 3(d), at 11.[54]

### 4. Plaintiffs Cannot Avoid the Heightened Pleading Requirements Regarding The Alleged Misrepresentation and Omissions by Purporting To Assert 10b–5(a) & (c) Claims

■ Plaintiffs' contention that they "need not allege or prove that Defendants made any misrepresentations or omissions of material fact" to prevail on a 10b–5(a) or (c) claim is simply not true in this case where their claims are based *only* on alleged misrepresentations and omissions. As such, plaintiffs must comply with the pleading requirements of the Reform Act.

Plaintiffs ignore *Schnell v. Conseco, Inc.,* 43 F.Supp.2d 438, 448 (S.D.N.Y.1999) (Parker, J.) (describing claims relating to the issuance of misleading research reports, use of fictitious investor names to send false opinions, cold calls to investors and failure to inform the public of defendant's true stake in the alleged scheme), cited by

politicians and their conclusions "may not properly be put on trial in this case").

52. Defendants have noted the plaintiffs' inappropriate allusion to other "evidence" they have in footnotes ten and sixty-three of their opposition memorandum. Surely plaintiffs are aware of the procedure for a motion to amend their complaints. They cannot hold such "evidence" back in the hopes of having yet a third bite of the proverbial apple.

53. Indeed, even the SEC and other regulatory agencies, which are not bound by the heightened pleading standards of the PSLRA, were not so audacious as to suggest—as plaintiffs do here—that *all* of the research reports were false and misleading.

54. Plaintiffs attack the description of the rating system set forth in the Dinallo Affidavit, stating that the "real" rating system was contained in a document that they now contend is not even referenced in their complaints. (Pls. Mem. at 43.) *See* Musoff Decl. Ex. 1, Internet Sector; Reset of Sector Ratings, August 7, 2000. In this Sector Report, Mr. Blodget explained that "[m]ost of the stocks at each rating have the following characteristics (we have made exceptions in some cases, with the reasons stated)." *Id.* at 2–4. Nowhere does he state that this is or ever was the basis for Merrill Lynch's ratings. In addition, the August 7, 2000 report shows that Mr. Blodget's group was not even rating Interliant at this time. *See id.* at 2.

Merrill Lynch, which directly rejected the tactic taken by plaintiffs here. Then–District Judge Parker held that because plaintiff's "market manipulation" claim was based on misrepresentations and omissions, plaintiffs claims were subject to the PSLRA's requirement that false statements and scienter be pleaded with particularity. *See id.*

Plaintiffs also ignore that, as explained by this Court, " '[m]anipulation is a term of art with a narrow definition.' " *Lewis v. Oppenheimer & Co.*, 481 F.Supp. 1199, 1202 n. 1 (S.D.N.Y.1979) (Pollack, J.) (quoting *Piper v. Chris–Craft Indus.*, 430 U.S. 1, 42, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977)); *see also SEC v. Martino*, 255 F.Supp.2d 268, 286 (S.D.N.Y.2003) (Pollack, J.) (describing various indicia of manipulation claims). Instead, plaintiffs rely on cases in which the alleged misrepresentations and omissions were but one piece of a larger alleged market manipulation scheme. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 563–65 (S.D.Tex.2002);[55] *In re IPO Sec. Litig.*, 241 F.Supp.2d at 293.

## II. PLAINTIFFS DO NOT OVERCOME THE BESPEAKS CAUTION DOCTRINE

■ Plaintiffs first argue that the ratings are not entitled to the protection of the bespeaks caution doctrine because the statements are not forward looking. In support of their position, plaintiffs assert that the reports and ratings reflected, among other things, the current opinions of the analysts based on current qualities

of the companies. This is incorrect. A recommendation to "buy" a stock is necessarily forward-looking because whether the stock price will appreciate is dependent on the unknowable variable of the future stock price. Moreover, plaintiffs' distinction is irrelevant because "mixed statements" consisting of forward looking and non-forward looking factors are nonetheless treated by courts as forward looking. *See Harris v. Ivax Corp.*, 182 F.3d 799, 806–07 (11th Cir.1999) (holding that sections of the prospectus qualified as forward looking even though they also contained statements of current conditions).

Plaintiffs also argue that the cautionary statements published in the very research reports plaintiffs challenge were ineffective because plaintiffs suggest that Merrill Lynch knew all along "with near certainty that the Grand Canyon lies one foot away." Plaintiffs' "Grand Canyon" is the bursting of the Internet bubble and the concomitant dramatic drop in the stock price of Interliant and 24/7. While Merrill Lynch warned of the risks associated with investing in 24/7 and Interliant, including the weaknesses in the companies' fundamentals and the high volatility associated with the respective stock price, at bottom, there are no particularized allegations of fact in the complaints that, if accepted as true, would (or could), demonstrate that Merrill Lynch knew "with near certainty" that 24/7's and Interliant's stock prices would not appreciate, e.g., by 10–20% within 12 months; that it could have predicted the date and dimensions of the Internet market collapse; and that it knew that the Internet market would not rebound as it had in the past.[56] Predictions of future trading

**55.** The *Enron* decision contained a half page footnote describing different types of market manipulation claims. *In re Enron*, 235 F.Supp.2d at 568 n. 8.

**56.** Conclusory allegations that Merrill Lynch knew the reports and ratings were false when made are insufficient to render the bespeaks caution doctrine inapplicable. *See Spencer*

*Trask Software & Info. Servs. v. RPost Int'l Ltd.*, No. 02 Civ. 1276(PKL), 2003 WL 169801, at *22 n. 16 (S.D.N.Y. Jan. 24, 2003) (distinguishing cases in which plaintiffs "made factual allegations regarding the defendants' knowledge of information which would make the cautionary statements fraudulent," noting that the complaint made "no factual allegations regarding [defendant's]

prices in the stock market are inherently speculative. There are no allegations in the complaints to support an inference that Mr. Blodget—either on the basis of hard information or a crystal ball—could have predicted with certainty how the future stock prices of any stock would fluctuate.[57]

Plaintiffs also argue that the cautionary statements were nothing more than "boilerplate." (Pls. Mem. at 49.) This is belied by the specific risks outlined in the reports themselves. Blodget's opinions of the possible future stock performance were replete with risk warnings of the potential that the stock price could drop significantly and the reasons why this might happen. For example, Merrill Lynch warned:

- 24/7 and Interliant both carried a "D" rating, which was published on the first page of every report and signified that the stocks have *"high potential for price volatility"* (ML 02084–02085 (emphasis added).)

- In May 1999, the report warned of potential problems associated with 24/7 financial controls and that "[t]his makes *accurate forecast of results difficult."* (Musoff Decl. Ex. 1, Bulletin, dated May 1999, at 1 (emphasis added).)

- In August 1999, after 24/7 announced strong second quarter figures, the report warned on the first page that *"the stock is likely to be extremely volatile."* (Musoff Decl. Ex. 1, Comment, dated Aug. 12, 1999, at 1 (emphasis added).)

- Reports on Interliant expressly cautioned investors that "the stock's *valuation is aggressive* in light of the company's relatively early stage of development and the *risk associated with the consolidation strategy."* (Musoff Decl. Ex. 2, Comment dated Aug. 12, 1999, at 3 (emphasis added); *see also* Ex. 2, Comment dated Oct. 29, 1999, at 3.)

- Regarding Interliant, the report cautioned that "the market is still very nascent—even by Internet standards—and *we expect it to develop 'in fits and starts.'"* (Musoff Decl. Ex. 2, Bulletin, dated Feb. 1, 2000, at 1 (emphasis added).)

- Again in February 2000, the report warned that "the [Interliant] story still represents a work in process.... We continue to have *concerns about low revenue visibility and volatile margins."* (Musoff Decl. Ex. 2, Comment dated Feb. 18, 2000, at 1 (emphasis added).)[58]

Merrill Lynch also repeatedly cautioned investors concerning the risks associated with 24/7 and, in particular, the 24/7 Connect ad-serving proprietary software which Mr. Blodget later described as a "pos." Indeed, this e-mail from October 2000—well after plaintiffs concede the Internet bubble burst—is the only contemporaneous fact that either plaintiff points to in support of their argument that Merrill Lynch's ratings on 24/7 and Interliant

---

knowledge of any barricades or existing concerns ... which would make the cautionary language fraudulent"); *see also In re Prudential Securities Inc. Ltd. Partnerships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y.1996) (plaintiffs identified specific information in defendants' possession that made the *cautionary statements* fraudulent).

**57.** Plaintiffs' assertions concerning Merrill Lynch's alleged motivations for issuing the reports—the purported undisclosed conflicts of interest and absence of sell recommendations – do *not* relate to the risks associated

with the *stocks. See Halperin v. EBanker USA.com. Inc.*, 295 F.3d 352, 357 (2d Cir. 2002); *see also Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 8 (2d Cir.1996). Accordingly, much of plaintiffs' argument simply misses the point.

**58.** All of these cautionary statements are taken from the research reports that plaintiffs allege are false and misleading. As set forth above, the Court may consider these documents for purposes of the instant motion as they are integral to the complaints.

were false or not reasonably believed. This example fails.

Mr. Blodget's concern over the successful development, rollout and functioning of the 24/7 Connect proprietary software was evident from his first reports on the company and was frequently reiterated. In his May 1999 report reinstating coverage of 24/7, for example, he cautioned that "[t]he major risk to our [24/7] financial projections, in our opinion, concerns the successful, on-time launch of [24/7] newly renovated ad-servicing solution (expected in Q3)." (Musoff Decl. Ex. 1, Comment, dated May 12, 1999, at 2.) Mr. Blodget also consistently reminded investors that questions about "the rollout to 24/7 Connect remain[ed] an overhang on all of 24/7's businesses and the stock." (Musoff Decl. Ex. 1, Bulletin, Dated May 11, 2000, at 2; see also Ex. 1, Comment, dated March 13, 2000, at 2.) By August 2000, Blodget cautioned investors that "24/7 [had] not yet completed the full rollout of Connect, whose last target date was June 30." (Musoff Decl. Ex. 1, Bulletin, dated Aug. 10, 2000, at 1; see also Comment, dated Aug. 11, 2000, at 1.) These cautionary statements demonstrate that Blodget communicated to investors from his first report on 24/7 his concern that the 24/7 Connect product may not perform as well as the company projected.[59] Therefore, Blodget's casual statement in October 2000 that the

product was a "pos," cannot be construed as inconsistent with the total message of his reports that there were significant concerns about the rollout and functionality of the product which could have a dramatic impact on the 24/7 stock price.

## III. PLAINTIFFS' CLAIMS ARE BARRED BY THE ONE–YEAR STATUTE OF LIMITATIONS

### (1) Statute of Limitations is an Appropriate Ground to Consider on a Motion To Dismiss [60]

■ In an effort to avoid the dispositive reach of the statute of limitations, plaintiffs' primary argument is that dismissal on statute of limitations grounds "is only appropriate when all of the facts necessary for determination of the question of the timeliness of the filing of the complaint are set forth in the complaint or in a limited universe of documents that are integral to or cited in the complaint." This is squarely contrary to LC Capital Partners. LP v. Frontier Ins. Group. Inc., 318 F.3d 148 (2d Cir.2003). There, the Second Circuit affirmed the Rule 12(b)(6) dismissal of a putative securities class action because the plaintiffs were on inquiry notice of the claims more than one year prior to bringing the action as a result of a publicly available news article and another filed action.[61] See id. at 155. Courts in this

---

**59.** Indeed, the securities laws do not require disclosure of any particular adjective when the overall message of caution is communicated to investors. See Salinger v. Projectavision, Inc., 934 F.Supp. 1402, 1415 (S.D.N.Y.1996) (defendants are not " 'required to characterize either possible results or their operations in a pejorative manner merely to cover all the bases should things turn out worse than expected' " (citation omitted)), complaint dismissed, 972 F.Supp. 222 (S.D.N.Y.1997); Rand v. Starter Corp., No. 94 Civ. 5325(DC), 1995 WL 322024, at *4 (S.D.N.Y. May 30, 1995); Kowal v. MCI Communications Corp., 16 F.3d 1271, 1277 (D.C.Cir.1994) ("Since the use of a particular pejorative adjective

will not alter the total mix of information available to the investing public ... such statements are immaterial as a matter of law and cannot serve as the basis of a 10b–5 action under any theory.").

**60.** Plaintiffs concede that the one-year statute of limitations applies. (Pls. Mem. at 54 n. 48.)

**61.** In LC Capital, the article was published in a more obscure source than the more mainstream publications at issue here, such as The Wall Street Journal, Business Week and The Economist.

district routinely dismiss securities fraud claims on statute of limitations grounds at the pleading stage where, as here, the facts necessary to trigger inquiry notice are apparent from the face of the complaint, the documents cited therein and other public documents.[62] *See Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.*, No. 02 Civ. 1230(LMM), 2003 WL 21088506, at \*3 (S.D.N.Y. May 14, 2003) (quoting *Dietrich v. Bauer*, 76 F.Supp.2d 312, 343 (S.D.N.Y.1999)); *In re Ultrafem Inc. Sec. Litig.*, 91 F.Supp.2d 678, 691–93 (S.D.N.Y.2000) (Preska, J.) (news articles put plaintiffs on notice of potential defects with product more than one year prior to plaintiff filing claims that company failed to disclose such defects); *see also Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir.1975); *Klein v. Goetzmann*, 810 F.Supp. 417, 427 (N.D.N.Y. 1993); *Westinghouse Elec. Corp.*, 821 F.Supp. at 222 ("[A] plaintiff is charged with knowledge of publicly available news articles and analysts' reports."); *see also Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1203–04 (10th Cir.1998) (reasoning that a single *Barrons'* article "directly" discussing issues raised in plaintiffs' complaint places plaintiff on inquiry notice).

### (2) Plaintiffs Were on Inquiry Notice of Their Claims More Than One Year Before They Filed Their Claims

■ The Second Circuit made clear in *LC Capital* that where, as here, plaintiffs are on inquiry notice of their alleged claims but undertake no inquiry, knowledge of the alleged facts constituting such claims shall be imputed to them as of the date the duty to inquire arose. *LC Capital*, 318 F.3d at 154. Here, plaintiffs' position is that they had no duty to inquire before April 8, 2002, when the Dinallo Affidavit was filed, and they do not allege that they conducted any inquiry prior to that date.[63] Thus, the only issue in this case is the date when plaintiffs were on inquiry notice of the basic "facts" underlying their claims. *See id.* at 154; *Nairobi Holdings*, 2003 WL 21088506, at \*3 (where plaintiff does not allege that it made any inquiry, "the only issue to be resolved is the date the duty to inquire arose").

Plaintiffs desperately rely on the phrase "probability of fraud" in an effort to avoid being charged with inquiry notice. (Pls. Mem. at 55–56.) Plaintiffs also take Merrill Lynch to task for describing the news articles as disclosing the "potential for the conflicts." (Pls. Mem. at 56 n. 49.) Yet, this is the language used by the Second Circuit in *LC Capital*. *See* 318 F.3d at 153–54, 157 (affirming district court which

---

**62.** Courts in fraud on the market cases look to publicly available information in finding that plaintiffs were on inquiry notice of their alleged claims. *See LC Capital*, 318 F.3d at 154–56. In any event, "an objective standard will determine whether plaintiff was on 'inquiry notice.' Thus, a plaintiff is charged with knowledge of publicly available news articles and analysts' reports." *Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.*, 821 F.Supp. 212, 222 (S.D.N.Y.1993) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983); *In re Ames Dep't Stores, Inc. Note Litig.*, 991 F.2d 968, 977, 979 (2d Cir.1993)).

**63.** Despite their attempt to shift the burden of proving the issue of inquiry notice (Pls. Mem. at 53), it is plaintiffs who "have the burden of affirmatively pleading facts demonstrating that they have sued in a timely fashion, as timeliness is an element of the plaintiff[s'] cause of action." *Weiss v. Ganz*, 26 F.Supp.2d 655, 658 (S.D.N.Y.1998) (dismissing the complaint where it "fail[ed]" to allege when plaintiff discovered the alleged fraud and why, in the exercise of due diligence, he could not have done so earlier").

found plaintiffs were on inquiry notice of *"potential* fraud" more than one year prior to commencing action) (emphasis added).

In any event, courts have found that the statute begins to run as long as plaintiffs were aware of the existence of alleged false *statements*, regardless of whether they were aware of alleged fraudulent *intent. See Addeo v. Braver*, 956 F.Supp. 443, 450–51 (S.D.N.Y.1997) ("[T]he question is not whether the materials suggested the full extent of defendant's deceit; the question is whether the materials suggested that there were any material misrepresentations.").[64] *See also, e.g., Fuqua v. Ernst & Young LLP*, 33 Fed.Appx. 569, 571, 2002 WL 535085, at *2 (2d Cir.2002) (stating that the radical decline in GFI's performance coming on the heels of rosy predictions constituted basis for inquiry notice); *Theoharous v. Fong*, 256 F.3d 1219, 1228 (11th Cir.2001) (" 'Plaintiff need not ... have fully discovered the nature and extent of the fraud before [he was] on notice that something may have been amiss.' ") (alterations in original) (citation omitted); *Ultrafem Inc.*, 91 F.Supp.2d at 692 (finding inquiry notice where "the omission of [information contained in an article] in the Offering is the essence of one of plaintiffs' claims").

### (3) Plaintiffs Were on Inquiry Notice of the Alleged Conflict of Interest and the Alleged Dearth of Sell Ratings

The alleged conflicts of interest and the dearth of sell ratings were issues widely debated in the financial markets and commentary long before the research reports challenged here were even issued, and the articles cited by plaintiffs in their own complaints were explicit in their discussions about them. While plaintiffs describe them as "generic statements," in fact, they are far more pointed and specific than generalized media reports. For example, the March 1999 article in *Crain's New York Business* revealed that:

> Mr. Blodget's value to Merrill Lynch is unmistakable. Internet initial public offerings have become huge moneymakers for investment banks, and firms frequently select their underwriters based upon the reputation of the analyst who covers their industry.

Jon Birger, *New Executive: Henry Blodget*, Crain's N.Y. Bus., Mar. 22, 1999, at 11 (cited in 24/7 Compl. ¶ 30; Interliant Compl. ¶ 32).[65] Moreover, despite plain-

---

64. Indeed, the cases upon which plaintiffs rely undermine their assertion that they could not have been on inquiry notice of the details of the specific fraudulent scheme they are alleging from the media reports of possible analyst conflicts. (Pls. Mem. at 53, 55.) Plaintiffs cannot get around the well-settled law in the Second Circuit that an investor does not have to have notice of the entire alleged fraud being perpetrated or the precise details of the alleged fraud to be on inquiry notice. *See Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 351–52 (2d Cir.1993); *see also Addeo v. Braver*, 956 F.Supp. 443, 450–51 (S.D.N.Y. 1997); *see also Salinger v. Projectavision, Inc.*, 972 F.Supp. 222, 229 (S.D.N.Y.1997); *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 815 F.Supp. 620, 637 (S.D.N.Y.1993). Moreover, courts have found inquiry notice once there is an arguable inconsistency between the published statements and the actual market conditions. *See Sedaghatpour v. DoubleClick, Inc.*, 213 F.Supp.2d 367, 373–74 (S.D.N.Y.2002); *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.*, 815 F.Supp. 620, 639 (S.D.N.Y.1993); *Siemens Solar Indus, v. Atl. Richfield Co.*, No. 93 Civ. 1126(LAP), 1994 WL 86368, at *5 (S.D.N.Y. Mar. 16, 1994).

65. *See Institutional Investor*, October 1999 ("too much conflict between banking relationship and the independent judgment necessary for hard calls;" "the concern is 'growing that the quality of research is suffering' ") (cited in 24/7 Compl. ¶ 44; Interliant Compl. ¶ 46); *Institutional Investor*, October 2000 ("[a]nalysts must bring in deals, *and there is an inherent conflict of interest there"*) (cited in 24/7 Compl. ¶ 44; Interliant Compl. ¶ 46 (emphasis added)); *Industry Standard*, June 12, 2000 (cited in Original 24/7 Compl. ¶ 24;

tiffs' undue emphasis on defendant's role as lead underwriter in the initial public offering for 24/7 and Interliant, such information was fully disclosed to the public on the cover of the prospectus for each IPO as well as in the research reports.

### (4) Plaintiffs Were on Inquiry Notice of the Allegation That Merrill Lynch Analysts Used Disparaging Language To Describe the Companies on Which They Had Positive Ratings

Mr. Blodget continued to recommend companies that he internally described as a "piece of crap," "piece of junk," or "piece of [expletive]." (24/7 Compl. ¶ 100; Interliant Compl. ¶ 100.) Plaintiffs' contention that they were not on inquiry notice of their claim because no company is specifically identified, after the bubble had burst, in the April 2, 2000 *Washington Post* article—which quotes Mr. Blodget as describing companies on which he had buy ratings as "pieces of [expletive]" (cited in 24/7 Compl. ¶ 40; Interliant Compl. ¶ 42)—is inconsistent with their allegations. Their complaints rely heavily on Mr. Blodget's reference to other companies not at issue in this action on which he had buy ratings as a "piece of [expletive]." (*Compare* Pls. Mem. at 60; *with, e.g.,* 24/7 Compl. ¶ 100; Interliant Compl. ¶ 100.) [66] The time period of the disparagement was after the bubble had burst and after plaintiffs had lost their money.

Defendants' issuance of "BUY" ratings even in the face of substantial declines in the trading price of the stocks (24/7 Compl. ¶¶ 131–132; Interliant Compl. ¶ 127) further put plaintiffs on inquiry notice more than one year prior to the commencement of this action. *See Fuqua*, 33 Fed.Appx. at 571 ("The radical decline in performance . . . coming on the heels of rosy predictions, constituted basis for . . . inquiry [notice].") For example, 24/7 plaintiffs allege that after the close of the class period, when defendants belatedly downgraded their ratings, stock prices had fallen more than 95% from the class period high. (24/7 Compl. ¶ 144.) "It is inconsistent for plaintiffs to argue, on the one hand, that the dramatically reversed financial data . . . shows that the previous statements were false and misleading, but on the other hand, that it could not have placed plaintiffs on inquiry notice of the fraud." *In re Warnaco Group. Inc. Sec. Litig.*, No. 00 Civ. 6266(LMM), 2002 WL 764980, at *4 (S.D.N.Y. April 29, 2002); *Bibeault v. Advanced Health Corp.*, No. 97 Civ. 6026 MJL/RJW, 1999 WL 301691, *5 (S.D.N.Y. May 12, 1999).

Plaintiffs' having brought their claims more than one year after their putative class periods end is further evidence that plaintiffs' claims are untimely. *See Levine v. NL Indus., Inc.*, 926 F.2d 199, 201–02 (2d Cir.1991). By terminating the class period on that date, plaintiffs are implicitly asserting that no putative class member

---

Original Interliant Compl. ¶ 25); *The Wall Street Journal.* July 14, 2000 ("absence of any sell ratings" in Blodget's ratings; Blodget as "more cheerleader than detached observer") (cited in 24/7 Compl. ¶ 52; Interliant Compl. ¶ 54.); *see also* Musoff Decl., Ex. 8.

**66.** Moreover, it strains credulity for plaintiffs to claim here that they could not have discovered the "facts" underlying the claims before the Attorney General filed his affidavit in support of his *ex parte* motion for an injunction.

The plaintiff in *re Merrill Lynch InfoSpace Analyst Reports Sec. Litig.*, No. 01–CV–6881(MP), (as well as several other plaintiffs) evidently believed that he had a basis for filing the *InfoSpace* complaint nine months prior to April 8, 2002, yet the Interliant plaintiffs, represented by the same counsel, aver that they could not have discovered their claim concerning Interliant securities—about which the Attorney General's affidavit says *nothing*—until the Attorney General filed his affidavit in April 2002.

was defrauded by defendants' misstatements or omissions after November 9, 2000 (24/7 plaintiffs) and February 20, 2001 (Interliant plaintiffs).

## CONCLUSION

Apart from the other reasons set forth above which warrant dismissal of the amended pleadings, the losses of the plaintiffs during the class periods are precluded from any recovery by what has been alleged herein. The plaintiffs' holdings of the stocks after the burst of the bubble wiped out their value during the purported class periods, which precludes any recovery on their behalf herein.

The Consolidated Amended Complaints are accordingly dismissed with prejudice.

So ordered.

## ORDER

Plaintiffs move for reconsideration of this Court's June 30, 2003 Decision and Order dismissing with prejudice the amended complaints in the 24/7 Real Media, Inc. (24/7) and Interliant, Inc. (Interliant) consolidated actions. In addition, the 24/7 plaintiffs move for amendment of the judgment and for leave to amend their consolidated amended complaint. For the reasons set forth below, the motions are denied.

### STATUTE OF LIMITATIONS AND RULE 59(e)

Plaintiffs find fault with the Court's determination, in *Part III* of the June 30 Decision and Order, that their claims are time-barred by the statute of limitations.[1] They assert that, the Court's findings notwithstanding, they were not on inquiry notice of the alleged fraud more than one year prior to the filing of their original complaints. In support of the motion for partial reconsideration, plaintiffs rely exclusively on the Second Circuit's recent decision in *Newman v. Warnaco Group, Inc.*,[2] claiming it should alter this Court's statute of limitations analysis.

■■■ The *Warnaco* decision does not change the analysis set forth in the June 30 Decision and Order. *Warnaco* relates to a corporate change in accounting practices, an entirely different set of facts. In the cases at bar, by contrast, there are no such comparable allegations. In their motion papers, plaintiffs have done nothing to change the unalterable, judicially-noticeable facts relating to the widespread public dissemination, years prior to the filing of the cases at bar, of information regarding research analyst conflicts of interest and the service of investment banking business.

The Court's June 30 Decision and Order noted that plaintiffs' current suits, and the New York Attorney General's report which precipitated them, simply

> brought to specific public attention certain aspects of the internal operations in securities firms that had notoriously and long existed and had been variously publicized but not focused on as undesirable conflicts that should be ameliorated, modified, conceivably controlled or eliminated.

Every complaint in this series of litigations claims it was inspired by the Dinallo Report. But, nothing in that Report acknowledges, indeed it strangely omits, any reference to the overwhelming notoriety expressed before and during the bubble, of the balancing facts of business life in the investment community (not inconsistent with ordinary understanding and experi-

---

**1.** *See Decision and Order, In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.*, 02 MDL 1484, 2003 WL 21500293 (S.D.N.Y. June 30, 2003), at *19–*22.

**2.** 335 F.3d 187, 2003 WL 21518460 (2d Cir. July 7, 2003).

ence). Some of the widely broadcast explanations that the business was not a public utility, in terms which could not have been misunderstood even by unsophisticated litigants in these suits, facts of ordinary comprehension, that were omitted in such a Report to the public, may be recalled from the following examples.[3]

(1) **May 2, 1996,** *Wall Street Journal,* "Today's Analyst Often Wears Two Hats" (Roger Lowenstein, at p. C1).

> Two scholars ... looked at every IPO (save for the tiniest) in 1990 and 1991, focusing on which were recommended and by whom. Their intent was to test the objectivity of underwriters....
>
> Messrs. Michaely and Womack differ from most financial scholars in that they write in English. Thus, we may quote their conclusion plainly: "The recommendations by underwriter analysts show significant evidence of bias and possible conflict of interest."
>
> Nor do the writers stint from identifying the source of conflict: Analysts get paid, in part, according to their contribution to corporate finance. To bring a company public, a firm needs its analyst on board. It is the analyst that explains–and implicitly, trumpets–the investment merits of the offering.

(2) **October 23, 1996,** *Boston Globe,* "Taking Analysts' Tempting Forecasts with Grain of Salt" (Steve Bailey & Steven Syre, at p. C1).

> [T]he bottom-line question, an important one for investors, is this: Can you trust what the analysts tell you?
>
> The mounting evidence: You trust them at your peril.
>
> A new study out of the Wharton School at the University of Pennsylvania and the Harvard Business School makes the case, saying analysts are systematically overly optimistic about long-term earnings forecasts for equity offerings. The researchers say the cause is the relationship between the analysts and the investment banking business that pays their bills....
>
> Patricia M. Dechow and Richard G. Sloan of Wharton and Amy P. Sweeney of the Harvard Business School studied 1,179 stock offerings from 1981 to 1990. Like others before them, they found that new stock offerings underperformed the market overall; they put that underperformance at 12.7 percent over five years....
>
> The integrity of the process was always supposed to be protected by the "Chinese wall" that separated the analysts and the investment banking business. But as commissions from trading have fallen on an increasingly competitive Wall Street, investment research hasn't been able to pay its own way.
>
> Instead, analysts have become an important sales tool for the investment bankers to land their super-profitable deals. A top analyst and the credibility he or she brings can be the difference between landing a deal or not–and the pay for the most sought-

---

**3.** "[O]n a motion to dismiss, a court may consider ... 'matters as to which judicial notice may be taken....'" *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (quoting *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993)). The Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment. *See In re Sterling Foster & Co., Inc. Secs. Litig.,* 222 F.Supp.2d 312, 321 (E.D.N.Y.2002); *Schwenk v. Kavanaugh,* 4 F.Supp.2d 116, 118 (N.D.N.Y.1998).

after analysts can top $5 million a year.

Can that analyst then turn around and "dis" the firm's full-freight client? Amy Sweeney of the Harvard Business School thinks not. "It is just a huge conflict of interest for the analysts," she says.

Adams Harkness' Frankel doesn't disagree: "That pressure is clear in the industry."

(3) **June 19, 1997,** *Wall Street Journal,* "All–Star Analysts 1997 Survey" (John R. Dorfman, at p. R1).

... At big firms, compensation of $300,000 to $600,000 for top analysts is common, and $1 million is possible.

Analysts earn that pay in lots of ways, some of which have little or nothing to do with picking stocks or accurately estimating corporate earnings. For example, at many firms, analysts are expected to bring in investment-banking deals–the job of handling the issuance of stock or bonds for companies, or of advising companies on mergers or acquisitions.

By the unwritten laws of Wall Street, brokerage houses don't handle a stock offering unless they expect to tout its stock for a while after the offering. In Wall Street parlance, a post-offering recommendation is commonly called a "booster shot."

Another important job of the analyst, at most firms, is to generate trading volume by getting clients excited about the recommended stocks. Even if they make superb recommendations, it's not enough for analysts to sit in a quiet room, listening to Bach and watching a computer screen. They have to work the phones, meet the clients, "pound the table" for the stocks they believe in. A great recommendation that nobody buys doesn't help the clients and doesn't make the brokerage firm any money.

(4) **April 8, 1998,** *Wall Street Journal,* "Heard in New England: Analysts May Hate to Say 'Sell,' But a Few Companies Do Hear It" (John Hechinger, at p. NE2).

Rough-and-tumble Wall Street isn't known for politeness. But many securities analysts seem to live by one childhood lesson: If you can't say something nice about a stock, don't say anything at all.

. . . . .

Last week, *The Wall Street Journal* asked First Call, the Boston firm that tracks investment research, to pore over analyst opinions of the 743 stocks of companies based in New England. Amazingly, only 13 companies received even one "sell" rating . . . .

Consider the extent of this speak-no-evil policy. Out of 2,066 ratings, 68% were "buys" or "strong buys," 31% were "holds" and less than 1% were "weak sells" or "strong sells."

Critics complain that these skewed results show dangerous flaws in Wall Street's stock picking. Chuck Hill, First Call's director of research, says analysts often won't issue a "sell" because they don't like to anger companies that could be their firm's investment-banking clients.

"The pressure on analysts is growing," says Mr. Hill, a former Wall Street analyst. "The Chinese wall that existed at most brokerage houses between analysts and investment bankers has broken down."

. . . . .

John Adams, chairman and chief executive of Adams, Harkness & Hill, the Boston brokerage firm, says he's careful to root out positive bias in his

firm's research. He claims that "sells" are scarce for a simple reason: They nearly always bear negative consequences for the analyst. Clients who hold the stock become livid, and the company's management can retaliate by keeping analysts out of the information loop. So, Mr. Adams says most analysts put out a "hold" rating, knowing that most investors consider it a "sell."

(5) **October 5, 1998,** *Business Week,* Cover Story, "Who Can You Trust? Wall Street's Spin Game – *Stock analysts often have a hidden agenda"* (Jeffrey M. Laderman, at p. 148).

... [A]nalysts who try to provide an honest and unconflicted opinion are becoming scarcer and scarcer on Wall Street. If there ever was a time when investors could use straight talk, it's now....

The question for investors is: "Can you trust your analyst?" Unfortunately, the answer is not very much. At the major Wall Street houses, which thrive on investment banking, every analyst has a potential conflict of interest. The "Chinese Wall" that on paper still separates a firm's analysts from its investment bankers continues to crumble as analysts are encouraged to scout deals. The analyst's firm is either the investment banker for a company he or she is covering–or it's wooing the company for a piece of that juicy revenue stream.

A study co-authored by Georgia State University assistant professor Siva Nathan looked at reports on 250 companies by analysts whose firms had investment-banking ties with those companies and an equal number from analysts with no ties. The investment bankers' analysts had 6% higher earnings forecasts and nearly 25% more "buy" recommendations.

. . . . .

Analysts routinely play up good news and sugarcoat the bad. Positive corporate news–an unexpectedly strong earnings report or successful product launch–may get a recommendation of "strong buy." Bad news gets a "hold" or "neutral"–often a euphemism for "sell," which has all but vanished from the analysts' vocabulary....

Investors are bombarded with bullish sound bites and "strong buy" and "outperform" tips in print and on the air.... Investors picking up such tips need to be wary about motives. Official research reports must disclose if the firm is or has been involved in an investment-banking relationship with the company. But news reports of recommendations may not carry such disclaimers. The war between investment research and investment banking began in the 1980s, but it has heated up in the deal-crazed '90s. The reason is simple: money. Most Wall Street research is pitched to institutional investors who pay the firm about a nickel a share in commissions. But if an analyst spends his time trying to land an initial public offering, the firm can earn 15 to 30 times that amount per share. Merger advisory fees can be sweet as well. And directly or indirectly, some investment-banking fees will find their way back to the analyst's pocket....

[W]hat happens when there's a conflict between objective analyses and the demands of investment bankers? "Conflict?" asks Brown, the former DLJ analyst. "There's no conflict. That's been settled. The investment bankers won." It's not far from the

truth. "Of all the jobs on Wall Street, the company analyst's role has changed the most in the last five years," says Alan Johnson of Johnson Associates, a Wall Street compensation consultant. "The analyst today is an investment banker in sheep's clothing."

(6) **March 22, 1999**, *Crain's New York Business,* "New Executive Henry Blodget; Merrill Lynch's Top Pick: Internet Analyst Lured from CIBC; On–Target Research Should Attract IPOs" (Jon Birger, at p. 11). Plaintiffs selectively quoted from this article in their complaints (24/7 Amended Compl. ¶ 30; Interliant Amended Compl. ¶ 32).

Mr. Blodget's value to Merrill Lynch is unmistakable. Initial public offerings have become huge money-makers for investment banks, and firms frequently select their underwriters based upon the reputation of the analyst who covers their industry.

. . . . .

Mr. Blodget is not as unabashedly bullish as some might think. True, he is a big believer in the Internet's business potential, and at CIBC maintained "buy" ratings on most of the firms he followed. However, his observations on the rise in Internet stocks are peppered with descriptives such as "bubble," "euphoria" and "tulip bulbs" – language usually associated with Internet skeptics.

"All stocks do not grow to the sky," says Mr. Blodget.

(7) **April 17, 1999**, *The Economist,* "Frog Spawn."

"Sell" is a four-letter word–but it is probably not out of a sense of decorum that Wall Street's financial analysts use it so rarely. Currently, "sells" account for a mere 1% of analysts' share recommendations, compared with "buys" at 68%. In the early 1980s, the ratio of buys to sells was roughly one to one. *The Economist,* along with some other market-watchers, has long suspected that the reason analysts have stopped uttering the S-word is that it no longer pays them to do so, even when they should; indeed it might get them fired.

Wall Street's top regulator, **Arthur Levitt**, chairman of the Securities and Exchange Commission, is now on the case. In a speech on April 13th he pointed out that most analysts work for firms that do business with the companies they pronounce upon. He fretted that they are under "unspoken pressures" to bring in and retain business for their firms–an analyst's compensation is often based in part on the profits made by his bank's trading desk and its investment-banking division. And that relies on a good client relationship. "Companies quite naturally look more favorably on bankers whose analysts profess a full appreciation of their virtues." Indeed.

In public, Wall Street brokers say that their research is objective, and its extreme bullishness has been more than justified in recent years. Privately, they concede that "sell" recommendations are bad for investment-banking business–but that investors know this, and correctly read between the lines when an analyst lowers his recommendation from "strong buy" to "buy," or from that to "hold" or "neutral." Mr. Levitt is not convinced. He said he was worried that investors heard from too many analysts keen to report that "what looks like a frog is really a prince." Sadly, of course, "sometimes a frog is just a frog." Unfortunately, Wall Street financial analysis is itself a pretty ugly frog. And it is not at all clear, beyond

speaking out about it, that Mr. Levitt has any way to turn it into a prince. Perhaps a kiss?

(8) **November 20, 1999,** Investors' Town Meeting, Albuquerque, New Mexico, "Remarks by SEC Chairman Arthur Levitt." (Similar remarks were given in another speech entitled "Investing with Your Eyes Open" by then-Chairman Levitt on February 12, 2000 before the *Los Angeles Times*'s 4th Annual Investment Strategies Conference in Los Angeles.)

Now, how many of you have seen analysts from Wall Street firms on television talking about one company or another? I'm willing to bet that not many of you have thought twice about that person's recommendation to buy or sell a particular stock. But, you should.

Most analysts work for firms that have business relationships with the same companies these analysts cover. And analysts' paychecks are typically tied to the performance of their employers. You can imagine how unpopular an analyst would be who downgrades his firm's best client. Is it any wonder that today, a "sell" recommendation from an analyst is as common as a Barbara Streisand concert?

As investors, you are confronted with a dizzying number of choices and opportunities. And those options can easily overwhelm and intimidate the most financially savvy person. In this day and age, there simply is no substitute for a person's awareness and wariness.

Don't fall for the illusion of easy money. And don't be pressured by an aggressive salesman or enticed by a fancy web site promising that you'll make a fortune with one quick gamble.

(9) **March 20, 2000,** *Fortune,* Cover Story, "The High Price of Research; *Caveat Investor: Stock and research analysts covering dot-coms aren't as independent as you think"* (Erick Schonfeld, at p. 118).

Objectivity should be the analyst's stock in trade. In the best of all worlds, analysts on Wall Street and at tech-industry research firms would spend their time giving unbiased, educated opinions about companies, markets, and trends. But in this world, filled as it is with dot-com money blowing every which way, objectivity seems a luxury few can afford. Analysts of all stripes–from Morgan Stanley's Mary Meeker on down to lowly researchers at the likes of the Aberdeen Group–increasingly derive a portion of their compensation, directly or indirectly, from the companies they cover. That helps put pressure on the quality of their work and encourages them to become more like cheerleaders than independent observers.

Let's be honest. It has always been hard to know how objective analysts really are. Consider who butters their bread. Wall Street investment banks compete to provide corporate finance services to many of the companies their analysts report on; firms such as Meta Group and Jupiter Communications sell consulting services and research to many of the companies that their analysts cover. Such basic conflicts have existed for years.

Internet mania exacerbates the problem . . . .

. . . Bill Burnham, an ex-Internet analyst at Credit Suisse First Boston and now a venture capitalist at Softbank, puts it bluntly: "In the technology world, there is no banking relationship without the analyst." The

analyst is judge, jury, and executioner when it comes to deciding whether to pursue a company as a banking client, and it is the analyst who has the closest relationship with the company after the deal is done.

"This can collapse into a situation where the analyst becomes a spokesperson for the firm he is analyzing," warns Mathew Hayward, a professor at the London Business School. His research shows that companies get higher ratings from analysts they bank with than from analysts they don't. One example: Soon after Bank of America Securities underwrote a follow-on offering for theglobe.com, its analyst at the time, Alan Braverman, initiated coverage of the stock with a buy rating. The stock now trades below its initial offering price.

(10) **April 2, 2000,** *The Washington Post,* "Analyst with a Knack for Shaking up Net Stocks; Henry Blodget Is Wall Street's Link Between Online Firms, Investors" (David Streitfeld, at p. H1).

... Blodget sees Amazon as a $100 stock in 12 to 18 months, which would only bring it back [down] to where it was two months ago.

And that's for a company he likes. Many of the weaker companies, he predicts, won't be around in five years....

...

Going to upgrade, he tells an assistant as he walks out the door at 8:20 p.m. Not that he expects Amazon to go up that much. "I think it's dead money for a while, but I want to differentiate it from all the pieces of [expletive] we have buys on," he says cheerfully.

. . . . .

Merrill is in the running to do the underwriting for the site's [*"Planet-*

*Out's"*] initial public offering, which makes this another conflict. If Merrill gets the job, Blodget will later be issuing reports on PlanetOut, and when was the last time an analyst was less than upbeat about a company his firm just underwrote?

"It's never happened," says author Hooke. "Any analyst whose firm does major investment banking work–and nearly all of them do–is suspect. I don't know why the SEC doesn't ask these firms to spin off their research operations."

Blodget admits that, for many analysts, "There's certainly a tendency to give the company a benefit of the doubt." But he argues that "the best analysts find a way of balancing the needs and wants of their constituencies."

(11) June 12, 2000, The Industry Standard, "Holding Analysts Accountable" (Eileen Buckley).

It's one of Wall Street's best-known secrets, and a dirty one. Research analysts writing recommendations of closely watched Internet stocks routinely face conflicts of interest.

Securities firms stand to rake in huge fees from underwriting the stock offerings of Internet companies, often the same companies that the firms' analysts recommend.

Thus, well before the internet bubble burst in March and April 2000, abundant material was in the public domain regarding the existence of widespread investment banking conflicts of interest and allegedly inflated buy ratings in Wall Street stock research, especially research related to new IPOs and technology companies. Plaintiffs make no allegation in their complaints that they read or relied upon the research reports that they allege misled them in the cases at bar. If they had read

the reports, however, they would have noticed a company-specific disclosure statement, contained on each and every one of the forty-four 24/7 Real Media reports and on each of the thirty-four Interliant reports at issue, plainly admitting that defendant "was a manager of the most recent public offering of securities of this company within the last three years." All of the seventy-eight reports also contained a statement that defendant "or its affiliates may from time to time perform investment banking or other services for, or solicit investment banking or other business from, any entity mentioned in this report."

Plaintiffs make the astounding assertion in a reply brief that the overwhelming collection of notices from the press and top securities regulatory officials "would not have allowed an investor of reasonable intelligence to piece together" the purported alleged "fraud." The plethora of public information would have required even a *blind, deaf, or indifferent* investor to take notice of the purported alleged "fraud." Every investor of reasonable intelligence would have been absolutely on inquiry notice. Plaintiffs overlook the "uncontroverted evidence [that] irrefutably demonstrates" the inquiry notice.

Having access to all of the information contained in the public domain regarding the abundantly publicized conceivable conflicts of interest, plaintiffs, after the bubble burst in March and April 2000, took no action against defendants throughout all of 2000 and 2001, even as publicity surrounding the conflicts of interest continued. In fact, plaintiffs took no action until the weeks immediately following publication of the Dinallo affidavit on April 8, 2002–almost two years after the bubble had burst. The first complaints in 24/7 and Interliant were filed on April 25 and May 1, 2002, respectively, and relied almost exclusively on the *ex parte* regulatory inquiry under New York's Martin Act.

■ Palpably, plaintiffs, and indeed the whole investment community, were on inquiry notice of the asserted "fraud" well more than one year prior to the filing of the complaints herein, which invoked the one-year statute of limitations terminating these suits.[4] As indicated in *Warnaco,* the very decision upon which plaintiffs attempt to rely, "The issue that the Court must consider is not whether Plaintiffs in this case were given inadequate information about the alleged inventory fraud but whether Plaintiffs 'had constructive notice of facts sufficient to create a duty to inquire further into that matter. An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice.' " *Newman v. Warnaco Group, Inc.,* 335 F.3d 187, 2003 WL 21518460, at *5 (2d Cir. July 7, 2003) (quoting *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 (2d Cir.1993)). The *Warnaco* Court further made clear that "[a] plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Id.* (quoting *Dodds,* 12 F.3d at 350); *see also In re Merrill Lynch Ltd. Partnerships Litig.,* 154 F.3d 56, 60 (2d Cir.1998) (noting that "the question of inquiry notice need not be left to a finder of fact").

As a final note, the dramatic decline in the price of Plaintiffs' shares in early 2000 also served to put them on notice of the alleged fraud. *See Benfield v. Mocatta Metals Corp.,* 26 F.3d 19, 23 (2d Cir.1994)

---

**4.** Maybe there is substance to the observation that may have influenced the regulators that, "Wall Street conflicts of interest are inevitable–they cannot be eradicated; they can only be policed." John C. Coffee, Jr., "Wall Street's Conflicts Cannot Be Settled," *Financial Times,* April 29, 2003.

(loss of value of highly recommended investment in a matter of months imposed a duty of inquiry); *see also Lenz v. Associated Inns and Restaurants Co.,* 833 F.Supp. 362, 375 (S.D.N.Y.1993) ("This court, and others both within and without the Second Circuit, have held that clear evidence that an investment asset has declined in value or has been subject to an artificially inflated estimate of its value, in direct contradiction of representation made to the plaintiff at the time of sale, constitutes inquiry notice as to the probability of fraud."); *Hupp v. Gray,* 500 F.2d 993, 997 (7th Cir.1974) (noting that "the fact which would have put a reasonable person on notice of the possibility of fraud, namely, the drastic fall in market price, was not concealed").

### PLAINTIFFS WILL NOT BE PERMITTED TO FURTHER AMEND

In addition to plaintiffs' failure to articulate a proper basis for reconsideration or for amending the judgment of dismissal to be without prejudice where only one of four grounds for dismissal is challenged in the reconsideration motion (as discussed above), plaintiffs' requests for leave to amend must be denied for at least three additional reasons: (1) plaintiffs have already amended their complaints once–with guidance from the Court–and have failed to state a claim; (2) plaintiffs' requests are untimely and procedurally improper; and (3) the proposed amendments would be futile.

**5.** Prior to the first amendment of these complaints, this Court specifically admonished plaintiffs in Case Management Order No. 3 that "[c]onsolidated amended complaints should also be carefully framed in order that they may fully comply with all applicable law regarding the pleading of loss causation." 2003 WL 21500293, at *7. The Court also reminded plaintiffs in the same Order "that they should take special care to comply with the particularized pleading requirements:"

#### a. Plaintiffs Have Already Had Ample Opportunity to Attempt to Plead Legally Sufficient Claims and Have Previously Amended Their Complaints

The 24/7 and Interliant plaintiffs have no right to a second amendment–a third bite at the apple–particularly where, as here, they had ample opportunity to craft their complaints and were advised by the Court, prior to amending their complaints, of certain pleading deficiencies and what the Court would require. As Judge Sweet held, quoting Judge Friendly, "where a district court judge puts plaintiff's counsel 'on the plainest notice of what was required,' justice does not require the court to 'engage in still a third go-around.'" *Moran v. Kidder Peabody & Co.,* 617 F.Supp. 1065, 1068 (S.D.N.Y.1985) (quoting *Denny v. Barber,* 576 F.2d 465, 471 (2d Cir.1978) (Friendly, J.)), *aff'd mem.,* 788 F.2d 3 (2d Cir.1986); *see also Blanchard v. Katz,* 705 F.Supp. 1011, 1013–14 (S.D.N.Y.1989) (Lasker, J.) (complaint dismissed with prejudice where plaintiffs "already had an opportunity to amend the complaint with notice of its deficiencies").

This Court was explicit in its instructions to plaintiffs concerning the pleading of loss causation and pleading with the particularity required by Fed.R.Civ.P. 9(b) and Section 21D(b)(1) & (2) of the PSLRA, and plaintiffs "failed to heed" these instructions.[5] *See* 2003 WL 21500293, at *15. For this reason alone, further

Each counsel who has been appointed Lead Counsel in a particular consolidated action is responsible for obtaining the necessary information such that the consolidated amended complaint for that case will comply with the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, in particular 15 U.S.C. § 78u–4(b)(1) & (2). The factual allegations must be specific to the security in

amendment will not be permitted. *See Denny*, 576 F.2d at 471; *see also In re Cybershop.com Sec. Litig.*, 189 F.Supp.2d 214, 236–37 (D.N.J.2002) (Pisano, J.) (denying leave to amend, noting that "[p]laintiff ha[d] already had its proverbial 'second bite at the apple' " when, following a case management conference in which the court had given plaintiff instructions concerning its pleadings, plaintiff served its first consolidated amended complaint).

#### b. Plaintiffs' Request to Amend Must Be Denied As Procedurally Improper

■ Where, as here, plaintiffs have waited until dismissal of their claims before requesting leave to amend, leave to amend is properly denied. In *Vine v. Beneficial Fin. Co.*, the Second Circuit found that it was "certainly within the district court's discretion" to deny plaintiff leave to file a second amended complaint, where "one basis for denial of leave to amend was the bad faith of appellant in waiting to see how he would fare on the prior motion to dismiss." 374 F.2d 627, 636–37 (2d Cir.1967) (district court denied leave to amend on ground that "[t]he new information alleged in the [proposed second amended] complaint was within plaintiff's knowledge before argument of the motion to dismiss the first amended complaint"). *Vine* is thus squarely on point here, where the purportedly "new" information was within plaintiffs' knowledge before argument on the motion to dismiss. In the June 30 Decision and Order, this

Court expressly noted plaintiffs' allusion to "other 'evidence' " and that plaintiffs were aware of the appropriate procedure to amend their complaints. Accordingly, this Court correctly concluded that "[t]hey cannot hold such 'evidence' back in hopes of having yet a third bite of the proverbial apple." *Merrill Lynch*, 2003 WL 21500293, at *17 n. 52.

Plaintiffs' contention that their complaints "should not have been dismissed with prejudice" because they have "indicated an ability to amend the complaint" should be rejected not only for the reasons stated in *Vine*, 374 F.2d at 636–37, but also because the cases plaintiffs rely upon do not support their position here. (*See* 24/7 Mot. for Lv. to Amend at 4; Interliant Mot. and Mem. for Partial Recons. at 3 (citing *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir.2000)) (citing *Oliver Schs., Inc. v. Foley*, 930 F.2d 248, 252–53 (2d Cir. 1991) (noting that leave to amend should be granted even without an explicit motion where the adverse party had knowledge of desire to amend), *cert. denied*, 534 U.S. 826, 122 S.Ct. 66, 151 L.Ed.2d 33 (2001))).

Plaintiffs' "indicated ability" and "desire" to amend the complaint prior to dismissal of these actions consisted of a footnote in their opposition brief explaining that although they had received "an initial production" of documents from the Attorney General's investigation, "they have not had any opportunity to conduct their own discovery," and believe that additional documents from the Attorney General will enable them to amend.[6]

---

question and should clearly allege who said what to whom concerning that security. 2003 WL 21500293, at *15.

6. The Interliant plaintiffs also alluded to unspecified "additional information" that they could provide in an amended complaint if the First Amended Complaint were dismissed. Plaintiffs' opposition brief otherwise includes no request for leave to amend their complaints and plaintiffs made no request to fur-

ther amend their complaints prior to the briefing on these cases, which began on April 30, 2003. Plaintiffs were also given three extensions for the purpose of filing their consolidated amended complaints.

More fundamentally, plaintiffs' suggestion that they must be afforded the opportunity to review additional documents from the New York Attorney General in hopes of finding additional documents that could be used to

*Gurary v. Winehouse,* relied on by plaintiffs, actually *supports* denial of plaintiffs' request for leave to amend, where, as here, plaintiffs merely indicated in their opposition brief that they could amend their complaints. *See* 235 F.3d at 801. *Gurary* held that the court did not abuse its discretion by denying leave to amend following plaintiff's first dismissal where plaintiff's request came in an affidavit opposing defendants' motion to dismiss. *See id.* at 796, 801 (citing *Confederate Mem'l Ass'n. v. Hines,* 995 F.2d 295, 299 (D.C.Cir.1993) ("[T]he district court did not abuse its discretion by denying leave to amend where plaintiffs made only a 'bare request.'")). *Oliver Schs. v. Foley,* 930 F.2d 248, 253 (2d Cir.1991), also does not support plaintiffs here because there, unlike here, the plaintiff had not previously amended its complaint. The same is true of the *Pangburn* and *Ricciuti* cases cited by the 24/7 plaintiffs in their separate motion "For Leave to Amend and to Amend the Judgment" (at 2–3). *See Pangburn v. Culbertson,* 200 F.3d 65, 68–71 (2d Cir.1999) (noting that a *pro se* litigant should have been given at least *one* opportunity to amend); *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir. 1991) (no prior amendment).[7]

### c. Amendment Would Be Futile and Is Properly Denied Here

▮▮▮ Plaintiffs' requests for leave to amend must be denied because they have given the Court no indication that they can amend their complaints to plead legally sufficient claims. "One good reason to deny leave to amend is when such leave would be futile." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995) (noting that district court examined proposed amended pleading and determined that additional allegations of fact "did not cure the complaint"); *Chill v. General Elec. Co.,* 101 F.3d 263, 271–72 (2d Cir. 1996) (affirming dismissal without leave to replead where district court concluded "that there is no indication that plaintiffs could replead the complaint so as to establish GE's scienter"); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 815 (2d Cir.1996) (affirming dismissal with prejudice of plaintiffs' first consolidated amended complaint because district found plaintiffs' proffers concerning additional information they could provide would not have cured pleading defects); *In re American Exp. Co. Shareholder Litig.,* 39 F.3d 395, 402 (2d Cir.1994) (stating that "leave to amend may be denied if the amendment would be futile"); *see also Cybershop.com,* 189 F.Supp.2d at 236–37 (rejecting plaintiffs' request in opposition brief to be given leave to amend if complaint dismissed where plaintiff had not demonstrated that amendment would not be futile); *Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc.,*

---

amend their complaints flies in the face of the objective of the PSLRA's *stay* of discovery, namely, that plaintiffs be able to plead legally sufficient claims *prior* to *any* discovery. *See* 15 U.S.C. § 78u–4(b)(3)(B). "This stay provision gives effect to Congress' intent that 'discovery should be permitted in securities class actions only after the court has sustained the legal sufficiency of the complaint.'" *Novak v. Kasaks,* No. 96 Civ. 3073, 1996 WL 467534, at *1 (S.D.N.Y. Aug. 16, 1996) (Schwartz, J.) (quoting Senate Comm. on Banking, Housing, and Urban Affairs, Private Securities Litiga-

tion Reform Act of 1995, S.Rep. No. 98, 104th Cong., 1st Sess. 14 (1995)).

7. The 24/7 plaintiffs' assertion that they are seeking "for the first time–to cure what appears to be a primary deficiency identified by the Court's Order of June 30, 2003" is incorrect. This is not their first amendment and as noted above, the Court had specifically admonished plaintiffs about the need to adequately plead loss causation *and* had given plaintiffs specific guidance on pleading with specificity prior to amendment.

195 F.Supp.2d 551, 563 n. 4 (S.D.N.Y. 2002) (same).

In *Cybershop.com*, the Court noted potential defects in plaintiffs' pleadings prior to their filing of a consolidated amended complaint. *See* 189 F.Supp.2d at 236. Noting that plaintiff had already had one opportunity to amend when it filed the consolidated amended complaint, the Court rejected its attempt to amend again because it had already had its "proverbial 'second bite at the apple.'" *Id.*

> Plaintiff has failed to proffer any proposed, substantive amendment that would satisfy applicable pleading requirements; indeed, it does not suggest any amendment at all. Plaintiff had ample opportunity to craft a sufficiently pled complaint when the Court directed it to review the annual report, consolidated the thirteen pending cases in to this single class action, and ordered the lead Plaintiff to file an amended class action complaint. .

*Id.* ("Ever mindful that leave to amend is ordinarily granted, *see* Fed.R.Civ.P. 15(a), the Court finds that any likely amendment will not cure the deficiencies plaguing the amended complaint."). The *Cybershop.com* Court further held that liberally allowing amendment is inconsistent with the PSLRA's heightened pleading standard and that courts are not required to repeatedly advise plaintiffs on how to improve their complaints. *See* 189 F.Supp.2d at 237; *see also In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332–33 (3d Cir. 2002).

Here, the 24/7 and Interliant plaintiffs' proffers are insufficient to show that amendment would not be futile. The 24/7 and Interliant plaintiffs' claims were dismissed on several grounds: (i) the complaints failed adequately to allege loss causation; (ii) the complaints failed to plead fraud with particularity, including failure to plead that the statements of opinion were false; (iii) the research analysts' opinions were inactionable because they adequately bespoke caution; and (iv) plaintiffs' claims were barred by the statute of limitations.[8] Any attempt to amend claims barred by the statute of limitations is futile. *See, e.g., de la Fuente v. DCI Telecomms., Inc.*, 206 F.R.D. 369, 387 (S.D.N.Y.2002) (McMahon, J.). But even were the Court to accept plaintiffs' argument that their claims are not barred by the statute of limitations–which, as discussed above, the Court will not do–the plaintiffs' motion for leave to replead does not address the three other independent grounds for dismissal and attempts only to address loss causation. Because none of the proposed amendments address all of the grounds for dismissal set forth in the Decision, the proposed amendments would necessarily be futile.

In the continually shifting sands of plaintiffs' loss causation arguments, the 24/7 plaintiffs seek to amend their Consolidated Amended Complaint yet again to add allegations that the price of 24/7 decreased more than certain internet stock indexes. Not only was this data available to plaintiffs years ago, but it utterly fails to address plaintiffs' deficiencies in pleading loss causation. The proposed allegations simply do not link any of the research reports to the decline in the price of 24/7. The price of 24/7 fell as a result of the bursting of the bubble–even if at a

---

8. The Court also found that the complaints were objectionable because they violated Rule 8(a)(2) & (e)(2) and recognized that defendants had reasonably requested that scores of paragraphs be stricken as immaterial under Rule 12(f) and considered dismissing them with leave to replead, but opted to work through the complaints in an attempt "to keep delays, costs and attorneys' fees at reasonable levels, and mindful of its obligation to construe pleadings so as to do substantial justice." 2003 WL 21500293, at *12–*13.

faster pace than the average–and the proposed allegations do not provide any facts from which it can be inferred that the 24/7 research reports were the cause of the decline. Indeed, plaintiffs allege quite the opposite (i.e., that the reports were overly optimistic). Nor do the allegations provide any support for plaintiffs' theory in their opposition brief that the 24/7 research reports artificially inflated the price of 24/7 stock. In fact, the proposed allegations are inconsistent with any theory of loss causation in that they allege that the price of 24/7 underperformed against the index while Merrill Lynch issued "favorable" ratings.

Plaintiffs, in a reply memorandum, have also resorted to a hitherto undisclosed and unargued claim that in a further amended pleading they would allege that, in addition to inflating the market price of the stock by unspecified false reporting, defendants manipulated the market in the securities of 24/7 by price leadership and dominion and control of the market for the security, and attempting to reduce the floating supply of the security. Plaintiffs' proposed amendment does nothing to put forth a cognizable basis for this claim. The only attempted proof submitted is attached to the reply brief—a previously unreleased private client investor list, which allegedly purports to show that Merrill Lynch clients had the largest holdings in 24/7 as of March 1, 2000 which suffered a huge decline at that time.

Plaintiffs state that they can show thereby a "collapse of the market for the security after the manipulator's activities cease" and cite this Court's opinion in *S.E.C. v. Martino*, 255 F.Supp.2d 268, 287 (S.D.N.Y. 2003) in support, as if that is meaningful.

Plaintiffs conveniently forget that the collapse of the Bubble and the market

price occurred in March 2000. The drop that plaintiffs point to and would rely on eight months later from $4.64 to $2.94 on November 9, 2000 reached there as a result of an extremely long decline occasioned months before and the November drop is not the situation considered in *Martino* in respect of the stock there involved. Plaintiffs' proposed amendment is a meaningless distraction proffered by plaintiffs and does not support or make out any semblance of a cause of action whatever.

Any flaws charged following long after an intervening market collapse do not deprive the defendants of the doctrine of loss causation, which operated herein in March 2000. By force of statute and as interpreted by the Court of Appeals in *Castellano v. Young & Rubicam:*[9]

> The loss causation requirement is intended to "fix a legal limit on a person's responsibility, even for wrongful acts."

### CONCLUSION

Plaintiffs' motions are denied in their entirety for the previous reasons and this supplement thereto.

So ordered.

---

**9.** 257 F.3d 171, 186 (2d Cir.2001) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir.1994)).